

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**11/12/2008**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 08-34031-H4-11 |
| TEXAS STANDARD OIL COMPANY, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

**MEMORANDUM OPINION ON DEBTOR'S MOTION FOR AUTHORITY TO**
**PERFORM UNDER PRE-PETITION NOMINEE AGREEMENT REGARDING HIGH**
**ISLAND A-96**
[Docket No. 56]

**I. INTRODUCTION**

This is a dispute between Texas Standard Oil Company (the Debtor) and certain creditors about the Debtor's desire to transfer property without receiving anything in return. In a Motion for Authority to Perform Under Pre-Petition Nominee Agreement Regarding High Island A-96 (the Motion), the Debtor requests this Court to authorize its transfer of an interest in an oil and gas lease for no consideration. The Motion, which was filed on September 25, 2008, is opposed by Forest Oil Corporation, Mariner Energy, Inc., and Mariner Energy Resources, Inc. (collectively, the Creditors), who filed their objection to the Motion on October 14, 2008. The Court held hearings on the Motion on October 16, 17, and 28, 2008.

The Debtor asserts that it filed the Motion out of "an abundance of caution" and that it does not need the Court's permission to transfer title. [Docket No. 56.] This Court disagrees. This Court believes that the Debtor does indeed need this Court's approval. *See* 11 U.S.C. § 363(b)(1) (providing that the debtor in possession may use, sell, or lease property of the estate only after notice and a hearing). After listening to the testimony of various witnesses, reviewing the exhibits, and hearing the oral arguments of counsel, this Court concludes that it should deny the Motion for the

reasons set forth in this Memorandum Opinion.

Set forth below are the Court's findings of fact and conclusions of law. To the extent that any finding of fact is construed to be a conclusion of law, it is adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is adopted as such. The Court reserves the right to make additional findings of fact and conclusions of law as it deems necessary and appropriate.

## II. FINDINGS OF FACT

1.  On July 28, 2006, Texas Standard Oil & Gas, LP (Texas Standard LP),[1] Frankel Offshore Energy, Inc. (Frankel), Grimes Energy Company (Grimes) and PetroVal, Inc. (PetroVal), (collectively, FGP)[2] entered into a Participation Agreement to bid on and acquire oil and gas leases (the Participation Agreement). [Creditors' Ex. 19.]

2.  Pursuant to the Participation Agreement, for any leases successfully bid on by FGP, Texas Standard LP would hold a 10% ownership interest, Frankel would hold a 50% ownership interest, PetroVal would hold a 25% ownership interest, and Grimes would hold a 15% ownership interest. [Docket No. 56, Ex. A.]

3.  Thereafter, FGP decided to bid $150,000.00 on High Island Block A-96, Federal Waters, Offshore Texas (HI A-96) in the Federal Lease Sale 204 to be held on August 22, 2007 (the Lease Sale). FGP was required to submit a 20% bid deposit (i.e. $30,000.00) to make a bid

---

[1] Texas Standard LP should be distinguished from Texas Standard Oil Company. The latter is the Debtor in this Case. The former is related to the Debtor insofar as Timothy Mark Roberson completely controls Texas Standard LP and is also the 50% owner of the Debtor.

[2] Although FGP may well have initially referred to Frankel, Grimes, and PetroVal, in fact this entity concerned not only Frankel, Grimes, and PetroVal, but also Texas Standard LP. Why a fourth letter—logically, it would be "T"—was not included in the name is unclear.

on HI A-96 at the Lease Sale. [Docket No. 56, Ex. A.]

4.      On August 17, 2007, the Debtor entered into a Nominee Agreement with Texas Standard LP concerning HI A-96. [Docket No. 56, Ex. B.]

5.      Because Texas Standard LP was not yet qualified to hold federal leases under the Regulations of the Minerals Management Service of the United States Department of the Interior (MMS), the Nominee Agreement provided that the Debtor would bid on HI A-96 on Texas Standard LP's behalf in the Lease Sale. [Docket No. 56, Ex. B.] The Debtor agreed to perform this task and hold the property for Texas Standard LP "in consideration of the recitals and the mutual undertakings set out in [the Nominee Agreement] and for such other good and valuable consideration." [Docket No. 56, Ex. B.] Grimes, PetroVal, and Frankel were not parties to the Nominee Agreement, nor were they mentioned therein.

6.      The Nominee Agreement also provided that "[i]f [the Debtor] is awarded a lease, then promptly after the award of a lease to [the Debtor] covering [HI A-96], [the Debtor] shall assign to [Texas Standard LP] 100% of the leasehold interests under the lease." [Docket No. 56, Ex. B.] The Nominee Agreement also prohibits the Debtor from attempting to "acquir[e] any leasehold interests in [HI A-96] for a period of five years from the date of [the] agreement." [Docket No. 56, Ex. B.]

7.      The members of FGP each turned over their respective amounts of the $30,000.00 bid deposit to the Debtor before the Lease Sale. Texas Standard LP provided its $3,000.00 share (i.e. 10% of $30,000.00) to the Debtor on August 22, 2007. [Docket No. 56, Ex. C.] Frankel provided its $15,000.00 share (i.e. 50% of $30,000.00) to the Debtor on September 4, 2007. [Docket No. 56, Ex. D.] PetroVal provided its $7,500.00 share (i.e. 25% of $30,000.00) to

the Debtor on August 22, 2007. [Docket No. 56, Ex. C.] Grimes provided its $4,500.00

share (i.e. 15% of $30,000.00) to the Debtor on August 22, 2007. [Docket No. 56, Ex. C.]

8.     The Debtor submitted a successful bid for HI A-96 at the Lease Sale on August 22, 2007.

[Docket No. 56, Ex. E.]

9.     Pursuant to the Participation Agreement, FGP paid the Debtor their respective shares of the

remaining bid amount ($120,000.00) and the required rental ($36,000.00). Because Frankel

did not pay its 50% share, the remaining members of FGP each paid double shares. Texas

Standard LP provided its $31,200.00 double share (i.e. 10% of $120,000.00, plus 10% of

$36,000.00, multiplied by 2) to the Debtor on September 19, 2007. [Docket No. 56, Ex. D.]

PetroVal provided its $78,000.00 double share (i.e. 25% of $120,000.00, plus 25% of

$36,000.00, multiplied by 2) to the Debtor on September 18 and 19, 2007. [Docket No. 56,

Ex. D.] Grimes provided its $46,800.00 double share (i.e. 15% of $120,000.00, plus 15%

of $36,000.00 multiplied by 2) to the Debtor on September 19, 2007. [Docket No. 56, Ex.

D.]

10.    The Debtor transmitted these funds to the MMS, and the MMS awarded a 60% undivided

interest in HI A-96 to the Debtor, a 25% undivided interest in HI A-96 to PetroVal, and a

15% undivided interest in HI A-96 to Grimes, effective October 1, 2007. [Docket No. 56, Ex.

F.] According to the testimony adduced at the hearing, the Debtor's 60% interest in HI A-96

is comprised of the following: a 20% interest paid for by Texas Standard LP, a 25% interest

paid for by PetroVal, and a 15% interest paid for by Grimes.

11.    Contrary to the language in the Nominee Agreement, the Debtor did not promptly assign its

interest in HI A-96 to Texas Standard LP despite this latter entity having become qualified

4

to hold federal leases in approximately October 2007 (i.e. only 45 to 60 days after the Lease Sale). Moreover, the Debtor has never assigned this interest to Texas Standard LP, or, for that matter, to PetroVal, or Grimes.

12.    Subsequently, disputes arose between Frankel and Texas Standard LP, PetroVal, and Grimes stemming from Frankel's alleged breach of the Participation Agreement.

13.    On December 4, 2007, Merit Energy Company, one of Frankel's creditors, filed an involuntary bankruptcy petition against Frankel in the United States Bankruptcy Court for the Southern District of Texas. Texas Standard LP, PetroVal, and Grimes joined in Frankel's bankruptcy proceeding as creditors asserting claims based upon Frankel's alleged breach of the Participation Agreement.

14.    On March 31, 2008, Texas Standard LP, PetroVal, and Grimes entered into a settlement agreement with Frankel in which they agreed to assign their interests in HI A-96 to Frankel (the Settlement Agreement). [Docket No. 56, Ex. G.] Specifically, the Settlement Agreement provides that Texas Standard LP, PetroVal, and Grimes shall hold their respective interests in HI A-96 in trust for the benefit of Frankel until November 1, 2009, and that any time prior to that date, upon Frankel's request, Texas Standard LP, PetroVal, and Grimes shall immediately assign their interests in HI A-96 to Frankel. [Docket No. 56, Ex. G.]

15.    On June 26, 2008, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

16.    On its initial schedules, the Debtor did not disclose that it held any interest in HI A-96. [Docket No. 16.] The Debtor subsequently amended its schedules to reflect that it holds an interest in HI A-96 for Frankel. [Docket No. 47.]

17.     On September 25, 2008, the Debtor filed the Motion. [Docket No. 56.] In the Motion, the
        Debtor requests that it be allowed to assign—without receiving any consideration—its 60%
        undivided interest in HI A-96 to Texas Standard LP pursuant to the Nominee Agreement.
        {Docket No. 56.] The Debtor has requested such relief so that Texas Standard LP may fulfill
        its obligations to Frankel under the Settlement Agreement.[3] [Docket No. 56.]

18.     On October 14, 2008, the Creditors filed their objection to the Motion, in which they assert
        that (1) the proposed transfer is to an insider corporation, (2) there was no consideration for
        the Nominee Agreement, (3) it would be inequitable to allow the Debtor to make a transfer
        at this time, and (4) there is no legitimate business purpose for the transfer. [Docket No. 68.]

19.     On October 16, 17, and 28, 2008, the Court held hearings on the Motion, at which the Court
        admitted exhibits offered by both parties, listened to testimony, and heard oral arguments of
        counsel.

### III. CREDIBILITY OF WITNESSES

At the hearing, the Court heard testimony from Charles Sharman (Sharman), the Debtor's
acting president and 10% shareholder. The Court finds Sharman to be less than credible. At the
hearing, Sharman was evasive in his answers to certain questions—especially concerning the
Debtor's involvement and agreements with the other members of FGP. Further, despite the

---

[3] The Debtor's request in the Motion to transfer a 60% interest in HI A-96 to Texas Standard LP is at odds with
the testimony of Sharman, the Debtor's president. At the hearing, Sharman testified that Texas Standard LP holds
equitable title to 20% of HI A-96 and that the Debtor holds nothing more than record title for the benefit of Texas
Standard LP. Based on Sharman's testimony, it would appear that the Debtor is requesting that this Court allow it to
transfer a 20% interest, not a 60% interest, in HI A-96 to Texas Standard LP. The Debtor made no attempt to address
or resolve this discrepancy at the hearing. Sharman's testimony, when taken together with the testimony of other
witnesses and admissions in the Motion that the Debtor currently owns and seeks to transfer a 60% interest in HI A-96,
raise suspicion that the Debtor was more than a mere instrument of Texas Standard LP with respect to its involvement
in the Lease Sale and its ownership interest in HI A-96.

admission in the Motion that the Debtor owns and seeks to transfer a 60% interest in HI A-96, and

despite Sharman's admission that the Debtor was awarded a 60% interest in HI A-96 by the MMS,

Sharman testified that the Debtor "owns nothing more than record title for the benefit of Texas

Standard LP," which is allegedly entitled to a 20% interest in HI A-96.  Sharman further contradicted

himself when he testified that "[the Debtor] bid for 60% on behalf of [Texas Standard LP]" and then

testified that the Debtor only bid 20% on behalf of Texas Standard LP.

      With respect to HI A-96, the Court also heard testimony from (1) David Michael Grimes,

vice president of Grimes; (2) Kimberly Anne McCollough, president and owner of PetroVal; (3)

Timothy Mark Roberson (Roberson), president of the general partner of Texas Standard LP and the

former president and still 50% owner of the Debtor; (4) Scott Allen Frankel, president and owner

of Frankel; (5) Allen H. Morgan, an oil and gas landman with 30 years of experience in land

management for oil and gas companies; and (6) Prentiss Fatherree, president of Highbaugh Field

Corporation, a company involved in a bid for another oil and gas property along with the Debtor.

The Court finds that all of these individuals were credible witnesses.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

      The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b),

157(a), and 157(b)(1).  This dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N),

and (O).  Venue is proper pursuant to 28 U.S.C. § 1408(1).

### B. Enforceability of the Nominee Agreement

      The Court must first determine whether the Nominee Agreement is enforceable.  If it is not,

the Debtor is not contractually obligated to transfer HI A-96 to Texas Standard LP, and the transfer

should not be permitted.

The enforceability of a contract is a matter of state law. *See Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.*, 644 F.2d 455, 458 (5th Cir. 1981) (citing *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959)). To be enforceable under Texas law, a contract must be supported by valid consideration—that is, "a bargained for exchange of promises." *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408-09 (Tex. 1997). Although a recital of consideration in a contract raises a presumption that the recital is valid, a party may rebut this presumption by showing that no consideration was actually given. *See Maykus v. Texas Bank & Trust Co. of Dallas*, 550 S.W.2d 396, 398 (Tex. Civ. App.—Dallas 1977, no writ); Restatement (Second) of Contracts § 218.

Here, the Nominee Agreement recites that it is supported by "the recitals and the mutual undertakings set out in this Agreement and for such other good and valuable consideration." [Finding of Fact No. 5.] The Creditors challenged this recital in their objection to the Motion and at the hearing—arguing that despite this recital, no consideration actually exists to support the Nominee Agreement. The Court agrees.

According to Sharman's testimony, the Debtor received nothing in exchange for bidding on Texas Standard LP's behalf or for promising to promptly relinquish HI A-96; no fee was to be paid to the Debtor for these services, nor were any promises made by Texas Standard LP that inured to its detriment, or to the Debtor's benefit. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) ("[Consideration] consists of either a benefit to the promisor or a detriment to the promisee."). Indeed, at the hearing, Sharman, the Debtor's acting president, testified that the Debtor agreed to bid for, and hold, HI A-96 on behalf of Texas Standard LP as "a matter of courtesy." Two other witnesses called by the Debtor—Prentiss Fatherree and David Michael Grimes—also testified

8

that companies generally agree to act as a nominee out of "professional courtesy." However, professional courtesy is not sufficient consideration to result in a binding and enforceable contract under Texas law.[4] *See Neil v. Shakelford*, 1876 WL 9183, at *2 (Tex. 1876) (recognizing that "voluntary courtesy" does not "constitute sufficient cause or consideration" for an enforceable contract); *Jameson v. Sibert*, 379 S.W.2d 86, 87-88 (Tex. Civ. App.—Beaumont 1964, writ ref'd n.r.e.) (upholding a jury finding that agreement based on an "exchange of a reciprocal measure of hospitality, a social amenity or courtesy or the performance of some service in pursuit of a common pleasure" lacked consideration).

Based on the parties' pleadings and the evidence and testimony adduced at the hearing, the Court concludes that there is no consideration to support the Nominee Agreement. This agreement is therefore unenforceable under Texas law. *See Fed. Sign*, 951 S.W.2d at 408-09. Because the Nominee Agreement is unenforceable, the Debtor is not contractually obligated to transfer its interest in HI A-96 to Texas Standard LP. Under these circumstances, this Court will not allow the Debtor to transfer its interest to Texas Standard LP—or, for that matter, to anyone—without receiving sufficient consideration in return.

## C. Even if the Nominee Agreement is enforceable, HI A-96 is nevertheless property of the estate which the Debtor may not transfer without receiving equivalent value in return.

Even if the Nominee Agreement is enforceable, HI A-96 would still be property of the Debtor's bankruptcy estate, which the Debtor may not assign without receiving sufficient consideration in return. The Debtor asserts that it holds only legal title to HI A-96 and that Texas Standard LP holds equitable title. However, the Bankruptcy Code does not distinguish between legal

---

[4] The Debtor's suggestion that nominee agreements are common in the oil and gas industry does not affect the legal principle that professional courtesy is not sufficient consideration to result in an enforceable contract.

and equitable title when defining "property of the estate." Property of the estate includes "*all legal and equitable interests* of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added). Additionally, 11 U.S.C. § 541(d) specifically provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a) of this section . . . to the extent of the debtor's legal title to such property." 11 U.S.C. § 541(d); *see also Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1014 n.10 (5th Cir. 1985) (noting that property of the estate over which the debtor has legal title but another party has equitable title "enters the bankruptcy estate . . . to the extent of legal title"); *Ga. Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 967-68 (5th Cir. 1983) (requiring equitable interest holder to turn over property to which the debtor held bare legal title because such property is part of the bankruptcy estate). The Debtor's legal interest in HI A-96 is therefore property of the estate and the Debtor must receive the Court's permission to effectuate a post-petition transfer of such property.[5] *See* 11 U.S.C. § 363(b)(1) (requiring "notice and a hearing" before the trustee or debtor-in-possession may transfer property outside the ordinary course of business); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("11 U.S.C. § 363(b) authorizes the debtor to sell or exchange property of the estate . . . *with court approval*." (emphasis added)).

The Debtor points to *Boyd v. Martin Exploration Co.*, 56 B.R. 776 (E.D. La. 1986) to support

---

[5] The Debtor also argues that the sale of HI A-96 is an "ordinary course of business" transaction, which does not require this Court's approval. However, at the hearing, Sharman testified that the Debtor is in the business of oil and gas exploration and production. Because the Debtor's interest in HI A-96 is an asset of the estate, and because bidding on behalf of, and conveying property to, other companies for no consideration is not part and parcel to oil and gas exploration and production, the proposed transfer of HI A-96 is not in the ordinary course of the Debtor's business. Accordingly, this proposed assignment is just the sort of transaction that requires court approval under 11 U.S.C. § 363(b)(1).

its position that it should be allowed to transfer HI A-96 to Texas Standard LP. In *Boyd*, the Debtor sought to transfer certain royalty interests in oil and gas leaseholds. The District Court for the Eastern District of Louisiana permitted the transfer because (1) the debtor held no legal or equitable title to the royalty interests, which had already been conveyed by formal assignment to the nominee; and (2) the court imposed a constructive trust for the benefit of the nominee, based on the nominee agreement requiring the debtor to transfer the royalty interests. *Boyd*, 56 B.R. at 778-81.

The Debtor's reliance on *Boyd* is misplaced for two reasons. First, the debtor and the nominee in *Boyd* entered into enforceable agreements that concerned a *present* transfer of the royalty interests pre-petition. *Id.* at 779. Second, the *Boyd* court applied Louisiana's constructive trust doctrine, which is markedly more liberal that the constructive trust doctrine under Texas law. *Id.* at 780.

### 1. Absence of a Pre-Petition Transfer to Texas Standard LP

Pre-petition agreements between the debtor and the nominee in *Boyd* provided that the debtor "does hereby TRANSFER, ASSIGN and CONVEY" the royalty interests to the nominee. *Id.* Further, the agreements recited that the nominee owns "a *present possessory* interest in the leaseholds effective as of the date of this agreement." *Id.* at 780 (emphasis added). As a result, the *Boyd* court determined that the royalty interests were not part of the bankruptcy estate because they were formally transferred to the nominee *prior* to the filing of the petition. *Id.* at 779.

Such is not the case here. The Nominee Agreement between Texas Standard LP and the Debtor did not purport make a present transfer of HI A-96; rather it provided that "promptly after the award of a lease to [the Debtor] covering [HI A-96], [the Debtor] shall assign to [Texas Standard LP] 100% of the leasehold interests under the lease." [Finding of Fact No. 6.] Although the

11

Nominee Agreement contemplated that the Debtor shall "promptly" transfer its interests in HI A-96 to Texas Standard LP, the Debtor did not effectuate a present transfer of those interests. [Finding of Fact No. 11.] *See Alamo Cas. Co. V. William Reeves & Co.*, 258 S.W.2d 211, 214 (Tex. Civ. App.—Fort Worth 1953, no writ) ("In Texas, where a transaction is one wherein the present passage of title is not contemplated, it is not a sale but may be construed to be a contract to sell. The essence of a sale is the present transfer of title to the property to the possessor thereof.") Therefore, contrary to the facts in *Boyd*—where the transfer of the interest had occurred prior to the filing of the bankruptcy petition—here, the Debtor's interest was never transferred prior to the filing of the Debtor's petition. Accordingly, on the date of the filing of the Debtor's petition, HI A-96 became property of the Debtor's bankruptcy estate and remains so today.

### 2. Imposition of a Constructive Trust

The Debtor also argues that, as in the *Boyd* case, it only holds legal title to HI A-96 and that a constructive trust should be imposed in favor of Texas Standard LP as the equitable title holder. The *Boyd* court acknowledged that "[t]he question of whether a constructive trust has been established is a matter of state law" and applied Louisiana's constructive trust doctrine to that case. *Id.* at 780. The case at bar, however, is governed by Texas law—which reserves the constructive trust doctrine for cases involving fraud or unjust enrichment. *See Pickelner v. Adler*, 229 S.W.3d 516, 527 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (explaining that Texas courts generally impose constructive trusts in cases sounding in fraud or unjust enrichment).

Under Texas law, a constructive trust is an equitable remedy "to prevent a wrongdoer, who by his fraudulent or otherwise wrongful act has acquired title to property, from retaining and enjoying the beneficial interest therein." *Pope v. Garrett*, 211 S.W.2d 559, 560 (Tex. 1948); *see also*

12

*Mills v. Gray*, 210 S.W.2d 985, 988 (Tex. 1948) ("[A] constructive trust generally involves primarily a presence of fraud, in view of which equitable title or interest should be recognized in some person other than the taker or holder of the legal title."). The Fifth Circuit has also explained that the imposition of a constructive trust in bankruptcy court "requires that one of the plaintiffs establish some wrongdoing on the bankrupt's part either in obtaining the funds sought or retaining them." *Wisconsin v. Reese (In re Kennedy & Cohen, Inc.)*, 612 F.2d 963, 965 (5th Cir. 1980).

Here, there is no evidence of fraud or wrongdoing by the Debtor. Granted, the Nominee Agreement expressly required the Debtor to "promptly" transfer its interest in HI A-96 to Texas Standard LP after the Debtor was awarded the lease [Finding of Fact No. 6], and the Debtor never did so. [Finding of Fact No. 11.] However, the Debtor did not hide this fact. Nor, and perhaps more importantly, did Texas Standard LP ever make demand upon the Debtor to transfer the interest—and Texas Standard LP certainly knew that the Debtor held the interest.[6] Indeed, Texas Standard LP became qualified to hold federal leases only a few months after the August 22, 2007 Lease Sale.[7] Therefore, its original rationale for having the Debtor take title to HI A-96 vanished; and yet no demand was made upon the Debtor to transfer the interest.[8] Rather, the hue and cry for the need for the Debtor to transfer the interest only occurred approximately one year later, when the Debtor was in the third month of its Chapter 11 bankruptcy. Moreover, Grimes and PetroVal—who now

---

[6] It is important to remember that Roberson completely controls Texas Standard LP as its general partner and is also the 50% owner of the Debtor. As such, there is no question that Texas Standard LP knew about the Debtor holding this interest.

[7] Sharman testified that Texas Standard LP became qualified to hold federal leases in October of 2007.

[8] It is still unclear to this Court why the Debtor was chosen to make the bid on HI A-96. The president of PetroVal, Kimberly Anne McCollough, testified that PetroVal was qualified to hold leases before the Lease Sale and that PetroVal "could have submitted the bid" instead of the Debtor.

13

indignantly threaten to sue the Debtor if it does not now assign the interest to Texas Standard LP—also made no demand upon the Debtor to transfer the interest, and yet, they also knew as of August 22, 2007 that the Debtor was holding the interest.[9]

For all of these reasons, there is no evidence of any fraud by the Debtor. Accordingly, because there is no such evidence, a constructive trust may not be imposed under Texas law.

## D. The Equities in this Case Also Disfavor the Imposition of a Resulting Trust

The Debtor next argues that a resulting trust—as opposed to a constructive trust—should be imposed for the benefit of Texas Standard LP.[10] In support of this contention, the Debtor relies on *Hellman v. Circle C. Properties* for the proposition that "[w]hen title to property is taken in the name of someone other than the person who advances the purchase price, a resulting trust is created in favor of the payor." *Hellman v. Circle C. Props., I, Ltd.*, No. 04-03-00217-CV, 2003 WL 22897220, at *2 (Tex. App.—San Antonio 2003, no pet.). While this statement of law accurately describes the mechanics of Texas's resulting trust doctrine, the Debtor overlooks the circumstances triggering its application. A resulting trust, like a constructive trust, may be imposed by the court as a matter of equity. "The purpose of invoking a resulting trust is to prevent unjust enrichment where a person has furnished trust property or consideration and an express trust fails." *Savell v. Savell*, 837 S.W.2d 836, 839 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (citing *Nolana Dev. Ass'n v. Corsi*,

---

[9] As discussed subsequently, the Court does not believe that Grimes and PetroVal have any cause of action against the Debtor, but for the purposes of reviewing whether there is any evidence of fraud, it is worth noting that even if Grimes and PetroVal do have a cause of action against the Debtor, it could not possibly be based on fraud because they have known all along that the Debtor bid on HI A-96 and became the legal title holder.

[10] At the hearing on October 28, 2008, counsel for the Debtor explained that resulting trusts and constructive trusts are conceptually confusing and that sometimes the terms are used interchangeably. However, Texas law clearly distinguishes between the two, and so does this Court. *See Pickelner v. Adler*, 229 S.W.3d 516, 527 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (explaining that a resulting trust is typically imposed to prevent unjust enrichment when an express trust fails, where a constructive trust is typically imposed to prevent fraud and where there is proof of unfair conduct or wrongdoing).

682 S.W.2d 246, 250 (Tex. 1984)); *see also Bailey v. Baily*, 987 S.W.2d 206, 212 (Tex. App.—Amarillo 1999, no pet.) ("[A] resulting trust arises when needed to prevent . . . unjust enrichment."). However, Texas courts are "suspicious of resulting trusts, and consequently, a heavy burden of proof is placed on the party attempting to establish the existence of one." *Savell*, 837 S.W.2d at 839.

In the case at bar, the Debtor has failed to meet this heavy burden of proof. Although Texas Standard LP provided the funds to facilitate the Debtor's purchase of HI A-96, the Debtor did not—pursuant to the Nominee Agreement—"promptly" assign its interest in HI A-96 to Texas Standard LP. [Finding of Fact No. 6 & 11.] Moreover, Texas Standard LP—which, importantly, is completely controlled by Roberson, who also owns 50% of the Debtor— never made any demand upon the Debtor to do so, and this is true even after Texas Standard LP became qualified to hold federal leases. Nor, for that matter, did anyone else ever make demand upon the Debtor to assign its interest. Then, after many months passed, the Debtor filed its Chapter 11 petition, and as a result thereof, the Debtor assumed fiduciary obligations to its creditors to take all efforts to maximize the value of the bankruptcy estate. It is these circumstances that, as a matter of equity, lead this Court to conclude that no resulting trust can be imposed in the case at bar.

It is also important to note that bankruptcy courts are doubly hesitant to impose an implied trust given that the decision to do so greatly affects the priority scheme. *See Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 436 (5th Cir. 1994) (noting that, because implied trusts "can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant to impose [them] without a substantial reason to do so").

Given that a resulting trust is only imposed where equity so requires under Texas Law and

15

given the particularly jarring effect that the decision to impose a resulting trust has in the bankruptcy context, this Court declines to impose a resulting trust in this case.  There are too many equitable factors weighing against the establishment of such a trust.  These factors are discussed below.

### 1.  Equitable Factor Number 1: The Debtor's Fiduciary Duties to Creditors

Because the Debtor is in bankruptcy, it has fiduciary duties to its creditors to maximize the value of its bankruptcy estate.  *See, e.g., Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 462 n.8 (6th Cir. 1982) ("A trustee in bankruptcy or a debtor-in-possession, as a fiduciary, represents both the secured and unsecured creditors of the debtor.").  The Court will not permit the Debtor to use the equitable implied trust doctrines as a foil to avoid its fiduciary duties to creditors.

The Court notes that the Creditors in this case have raised arguments that the Debtor would have normally raised were it acting pursuant to its fiduciary duties to creditors.  Given that a 60% interest in HI A-96 is an asset of some unknown value, a debtor fulfilling its fiduciary duties to the estate would presumably want to assert that it is *not* obligated to transfer HI A-96 pursuant to an agreement that is unenforceable for lack of consideration.  Such a debtor would have asserted that the Court should not impose an implied trust to require it to transfer an asset out of the estate for no consideration.[11]  Such a debtor would have negotiated some consideration for transferring even a bare legal interest in HI A-96.  Such a debtor would have taken the position that those entities that provided the funds to purchase the asset should file claims against the estate along with the other

---

[11] It is exceedingly rare that a debtor-in-possession requests that a bankruptcy court impose an implied trust with respect to property of the debtor's bankruptcy estate for the benefit of a third party.  Normally, third parties will initiate an adversary proceeding against a debtor to establish that certain property alleged by the debtor to be in the debtor's bankruptcy estate is held in trust for their benefit.  Notably, the Restatement (Second) of Trusts does not even address the issue of a trustee's standing to bring an action to enforce an implied trust.  *See* Restatement (Second) of Trusts § 200 (1959) ("No one except a beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust or to enjoin redress for breach of trust.").  Indeed, the Debtor would have met with some strange looks in state court had it brought an action to impose an implied trust against itself—which is essentially what it has done here.

creditors.  Instead, this Debtor, over the objection of the Creditors, requests this Court to allow it to

transfer an asset out of the estate without receiving anything in return.  It appears that the Debtor's

50% owner, Roberson, wishes to transfer the Debtor's legal interest in HI A-96 solely to shield the

entity which he completely controls, Texas Standard LP, from liability under the Settlement

Agreement (to which the Debtor is *not* a party).  Such a motive is a flagrant disregard for the

Debtor's fiduciary duty to maximize the return for its Chapter 11 estate for the benefit of creditors.

### 2. Equitable Factor Number 2: The Insider Nature of the Transaction

As both parties concede, insider transactions are subject to heavy scrutiny in bankruptcy

court.  *See In re Holloway*, 955 F.2d 1008, 1010-11 (5th Cir. 1992); *see also* 2 Collier on Bankruptcy

¶ 101.31, at 101-87 (15th ed. 1991) ("An 'insider' generally is an entity whose close relationship

with the debtor subjects any transactions made between the debtor and such entity to heavy

scrutiny.").  Here, the proposed transfer between the Debtor and Texas Standard LP is clearly an

insider transaction that is subject to heavy scrutiny.  Sharman, the Debtor's current president,

testified—and no one disputes—that Roberson completely controls Texas Standard LP and is also

the 50% owner of the Debtor.  Sharman also testified that Roberson was president of the Debtor at

the time the Nominee Agreement was executed, and that Roberson had Sharman sign the Nominee

Agreement on behalf of the Debtor to avoid the appearance of a conflict of interest. As already noted

in the preceding paragraph, Roberson's insider status—and Sharman's apparent willingness to act

as proxy for Roberson—has caused the Debtor to disregard its fiduciary duties to creditors and

instead focus on shielding the entity that Roberson completely controls, Texas Standard LP, from

suits by Frankel, Grimes, and PetroVal.

The Debtor complains that, if not permitted to transfer HI A-96, it will be liable to Texas

17

Standard LP, Grimes, and PetroVal. This argument is seriously flawed and underscores the incestuousness of this proposed insider transaction. First, the Debtor cannot be liable to Texas Standard LP under the Nominee Agreement because that agreement is, as this Court has already concluded, unenforceable as a matter of law. Moreover, even if the Nominee Agreement was enforceable, the Debtor's avowed fear that Texas Standard LP will bring suit for the Debtor's breach of this agreement (i.e. for failing to assign its interest in HI A-96) is unfounded. In fact, the Debtor has already twice breached the Nominee Agreement and Texas Standard LP has not sought any recourse. The Nominee Agreement required the Debtor to promptly assign HI A-96 to Texas Standard LP after the Lease Sale. [Finding of Fact No. 6.] However, the Debtor made no attempt to transfer the property to Texas Standard LP until after filing its bankruptcy petition, almost a year after Texas Standard LP became qualified to hold federal leases. [Finding of Fact No. 11.] Additionally, the Nominee Agreement provides that if Texas Standard LP does not choose and qualify an operator, the Debtor shall act as operator under the lease for a period "not to exceed 90 days from the award of the lease." [Docket No. 56, Ex. B.] The Debtor has breached this provision of the Nominee Agreement as well since Texas Standard LP has not chosen or qualified an operator and the Debtor has been acting as operator for over one year.

The insider nature of this transaction may explain why Texas Standard LP did not immediately demand that the Debtor turn over HI A-96 in accordance with its obligations under the Nominee Agreement. It may also explain why the Debtor undertook its obligations under the Nominee Agreement "as a matter of courtesy." That Roberson completely controls Texas Standard LP and also owns 50% of the Debtor, and that Texas Standard LP has excused the Debtor's past breaches of the Nominee Agreement, leaves little doubt that the Debtor need not fear reprisal from

18

Texas Standard LP if the Motion is not granted.

Aside from the Debtor's ersatz liability to Texas Standard LP, the Debtor cannot be liable to PetroVal, Grimes, or Frankel because those companies were not parties to the Nominee Agreement, nor were they mentioned in the agreement as third party beneficiaries. [Finding of Fact No. 5.] There has been no evidence to suggest that the Debtor entered into enforceable agreements (written or otherwise) with either Grimes, PetroVal, or Frankel. Further, to presume that the Debtor will be held liable under the Settlement Agreement would be to presume that the Debtor and Texas Standard LP are the same entity, which would necessarily mean that legal and equitable title cannot be distinguished for the purposes of imposing a resulting trust.

The Debtor wishes to distinguish legal and equitable title only when it suits the Debtor's purposes to do so. On its initial schedules the Debtor did not disclose that it held any interest in HI A-96. [Finding of Fact No. 16.] The Debtor subsequently amended its schedules to reflect that it holds an interest in HI A-96 for Frankel [Finding of Fact No. 16]—suggesting that the Debtor is liable to Frankel under the Settlement Agreement along with Texas Standard LP, Grimes, and PetroVal. The Debtor admits in the Motion that it still does not believe that it has any severable interest in HI A-96 that can be considered property of the estate, and that it amended its schedules out of an abundance of caution to reflect its "bare legal title." However, despite these admissions, at the hearing the Debtor staunchly maintained that the Debtor's legal interest in HI A-96 should be treated as separate and distinct from that of the alleged equitable title holders for the purposes of imposing a resulting trust.

Thus, on the one hand, the Debtor would have this Court treat the Debtor and Texas Standard LP as separate entities when construing the obligations under the Nominee Agreement; but, on the

other hand, would have this Court believe that the Debtor will be liable to Frankel, Grimes, and PetroVal for Texas Standard LP's failure to perform under the Settlement Agreement. The Debtor cannot have it both ways. Either the Debtor and Texas Standard LP are separate entities or they are not. If they are separate entities, the Debtor is not contractually obligated to transfer legal title to Texas Standard LP under the Settlement Agreement (which, importantly, the Debtor did not sign); and a transfer without consideration is not only unnecessary, but adverse to the interests of the Debtor's Chapter 11 estate. Conversely, if the Debtor and Texas Standard LP's interests are so intertwined that they are one and the same, then no distinction should be made between legal and equitable title to HI A-96 and the entire leasehold interest is property of the estate—and therefore the imposition of a resulting trust would be inappropriate.

### 3. Equitable Factor Number 3: The Debtor's Purposes in Filing for Bankruptcy

The Court is concerned that the Debtor has not filed its Chapter 11 petition to reorganize and attempt to pay claims, but rather out of some motive unrelated to the legitimate purposes of bankruptcy.

According to the Debtor's most recent monthly operating report, the Debtor is operating significantly in the red. For the months of July, August, and September, 2008, the Debtor's statement of income reported net losses of $96,824.45, $402,334.29, and $42,293.81, respectively. [Docket No. 83.] Additionally, the Debtor's net revenue for those months are listed as $34,096.85, $14,836.81, and $15,130.21, respectively. [Docket No. 83.] The paltry revenues currently being generated by the Debtor and the significant losses the Debtor has recently incurred raise an important point: With these numbers, it is highly unlikely that the Debtor will be able to propose a feasible plan of reorganization.

Indeed, during the first four and a half months of this case, the Debtor has filed no disclosure statement or plan. Rather, prior to filing the Motion, the only other substantive relief sought by the Debtor in this case came in the form of its Emergency Motion to Sell Assets of the Estate Free and Clear of Liens and Other Interests and Motion to Eliminate Ten-Day Stay Under Bankruptcy Rule 6004(h). [Docket No. 31.] At the hearing on that emergency motion, which took place on August 14, 2008, the Debtor sought to effectuate a sale of its 75% participation interest in an oil and gas prospect to Texas Standard LP on an expedited basis and without any bid procedures. The Court denied that motion for many of the same reasons articulated in this Memorandum Opinion—namely, because the Debtor sought to effectuate a transfer of an estate asset to an insider (Texas Standard LP) on an expedited basis, without regard for its fiduciary duties to creditors. Indeed, the creditors opposing the emergency motion raised the same concerns about the Debtor's disregard for its fiduciary duties to creditors as are raised with respect to the Motion. Thus, this is not the Debtor's first attempt to effectuate insider transfers based on motives unrelated to paying claims or preserving the Debtor's bankruptcy estate.

The Debtor's woefully unprofitable performance during this Chapter 11 case and its sole focus on promoting insider transactions cast doubt on the Debtor's motivation in filing this Chapter 11 case. Indeed, it appears that the Debtor has less interest in reorganizing its business and paying claims than it does in transferring estate assets out to related entities. The bankruptcy process is not a tool for business entities to use to delay and frustrate creditors or to effectuate insider deals under the guise of legitimacy. These circumstances—when taken together with the Debtor's general disregard for its fiduciary duties to creditors and the insider nature of the HI A-96 transaction—speak to the inequity of imposing a resulting trust in this case.

21

## V. CONCLUSION

This Court concludes that the Debtor should not be permitted to transfer its interest in HI A-96 to Texas Standard LP.

The Debtor's illusory Nominee Agreement with Texas Standard LP (an entity wholly owned by the Debtor's 50% owner, Roberson), its unexplained participation in the Lease Sale on behalf of the other members of FGP culminating in an award of 60% of HI A-96 to the Debtor, and its failure to promptly assign its interest in HI A-96 once Texas Standard LP became qualified, all cast a pall of suspicion over the Debtor's sudden post-petition desire to transfer its interest in HI A-96. The Nominee Agreement is devoid of consideration and is unenforceable. Additionally, the Court will not impose an implied trust as a matter of equity on these facts—where the bells of equity ring for the Creditors, rather than the Debtor. A post-petition transfer without consideration of the Debtor's interest in HI A-96, held by the Debtor for over a year, is against the expectation of creditors and has no legitimate business purpose other than to benefit another company in which the Debtor's 50% shareholder completely controls. *See In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession . . . to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business reason for using, selling, or leasing . . . property.").

Having concluded that the Debtor's interest in HI A-96 is property of the estate and that the Debtor may not assign it without receiving sufficient consideration in return, the Court now expects the Debtor to fulfill its fiduciary obligations to the creditors of the Chapter 11 estate and use this asset to help pay claims in this case. To do otherwise undermines one of the twin pillars of bankruptcy; namely, to pay allowed claims against the estate. *See In re T-H New Orleans Ltd.*

22

*P'ship*, 188 B.R. 799, 807 (Bankr. E.D. La. 1995) (noting that one of the competing goals of bankruptcy and reorganization is "the satisfaction of valid claims against the estate").

To ensure that the Debtor complies with its fiduciary duties to the estate and its creditors, and to ensure that the Debtor remains focused on the goal of satisfying valid claims against the estate, an auction will be held in open court to sell the Debtor's interest in HI A-96. The Court will hold a status conference to obtain input from the Debtor, the Creditors, and any other parties-in-interest on bid procedures and the holding of the auction; and thereafter, the Court will issue a separate order on concerning this auction.

For the forgoing reasons, the Motion should be denied. An order consistent with this opinion will be entered on the docket simultaneously herewith.

Signed on this 12th day of November, 2008.

Jeff Bohm
United States Bankruptcy Judge

23