## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 08-34031** |
| | § | |
| **TEXAS STANDARD OIL COMPANY,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

---

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
## DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION
Dated: January 19, 2009
Houston, Texas

---

Wayne Kitchens, Esq.
David Askanase, Esq.
Heather McIntyre, Esq.
**HUGHESWATTERSASKANASE, LLP**
Three Allen Center
333 Clay Street, 29th Floor
Houston, Texas 77002
Tel: 713.759.0818
Fax: 713.759.6834
ATTORNEYS FOR DEBTOR,
TEXAS STANDARD OIL COMPANY
DATED: January 19, 2009

## TABLE OF CONTENTS

Page

**ARTICLE 1 – INTRODUCTION** ......................................................................1
  *1.1* **Preliminary Statement** .................................................................1
  *1.2* **Purpose of Disclosure Statement** ...............................................2
  *1.3* **Explanation of Chapter 11** .........................................................3
  *1.4* **Procedure for Filing Proofs of Claim and Proofs of Interest** ...............4
      *1.4.1* **Bar Date for Filing of All Proofs of Claim (Other Than Administrative Claims) and Proofs of Interest** .........................4
      *1.4.2* **Effect of Amendments to Schedules** .................................5
      *1.4.3* **Executory Contracts and Unexpired Leases** ....................5
  *1.5* **Voting Procedures and Requirements** .......................................5
      *1.5.1* **Persons Entitled to Vote** ................................................5
      *1.5.2* **Voting Instructions** .......................................................5
          *1.5.2.1* **Ballots** .........................................................5
          *1.5.2.2* **Incomplete or Irregular Ballots** .....................6
          *1.5.2.3* **Ballot Retention** ...........................................6
      *1.5.3* **Approval of Disclosure Statement** ...................................7
      *1.5.4* **Confirmation Hearing** ....................................................7
      *1.5.5* **Objections** ....................................................................7
**ARTICLE 2 – BACKGROUND OF THE DEBTOR AND ITS BUSINESS** ................7
  *2.1* **Introduction to Plan of Reorganization** ....................................7
  *2.2* **Background About the Debtor** .....................................................8
      *2.2.1* **Incorporated Information** ................................................8
      *2.2.2* **Business** ........................................................................8
      *2.2.3* **Assets of the Debtor** ......................................................9
**ARTICLE 3 – PROCEEDINGS IN THE CHAPTER 11 CASE** ...............................10
  *3.1* **Events Leading to Bankruptcy and Administration of the Case** .........10
      *3.1.1* **Non-Residential Real Property Leases** ...........................14
      *3.1.2* **Appointment of Committee of Unsecured Creditors** .............14
      *3.1.3* **Retention of Professionals** ............................................14
      *3.1.4* **341 Meeting** ..................................................................14
      *3.1.5* **Assumption and Rejection of Executory Contracts and Leases** .............15
  *3.2* **Claims Process and Bar Date** .....................................................15
**ARTICLE 4 – GENERAL OVERVIEW OF THE PROPOSED PLAN OF REORGANIZATION** ..................................................................16
**ARTICLE 5 – RISK FACTORS** ......................................................................17
  *5.1* **Business Risks** ............................................................................17
      *5.1.1* **Lack of Capital Resources** .............................................17
      *5.1.2* **Davis Trust Well** ...........................................................17
      *5.1.3* **Apache Well** .................................................................17
      *5.1.4* **Note Receivables** .........................................................17
  *5.2* **Risks Related to Projections and Estimates** .............................18

| | | |
|---|---|---|
| *5.3* | *Competition* | 18 |
| *5.4* | *Governmental Regulation* | 19 |
| *5.5* | *Bankruptcy Risks* | 19 |
| | *5.5.1   The Appeal* | 19 |
| | *5.5.2   Risk of Nonconfirmation of the Plan* | 20 |
| | *5.5.3   Nonoccurrence of Effective Date of the Plan* | 20 |

**ARTICLE 6 – TREATMENT OF CLAIMS WITHIN THE PROPOSED PLAN OF REORGANIZATION** .................................................................20

| | | |
|---|---|---|
| *6.1* | *Class 1 – Allowed Administrative Expense Claims* | 20 |
| *6.2* | *Class 2 – Allowed Secured Ad Valorem Tax Claims* | 21 |
| *6.3* | *Class 3 – Allowed Federal Tax Claims* | 21 |
| *6.4* | *Class 4 – Allowed Priority Wage Claims* | 21 |
| *6.5* | *Class 5 – Allowed Secured Claim of Forest Oil Corporation* | 22 |
| *6.6* | *Class 6 - Allowed Secured Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc.* | 22 |
| *6.7* | *Class 7 – Allowed General Unsecured Claims* | 23 |
| *6.8* | *Class 8 – Allowed Claims Related to High Island A-96* | 23 |
| *6.9* | *Class 9 – Ownership Interests* | 24 |

**ARTICLE 7 – PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND MAKING DISTRIBUTIONS UNDER THE PLAN** ...................................24

| | | |
|---|---|---|
| *7.1* | *Objection Deadline* | 24 |
| *7.2* | *Prosecution of Objections* | 24 |
| *7.3* | *Distributions* | 24 |
| | *7.3.1   Payment of Distributions* | 24 |
| | *7.3.2   Distributions to Class 5* | 24 |
| | *7.3.3   Distributions to Class 6* | 25 |
| | *7.3.4   Distributions to Class 7* | 25 |
| | *7.3.5   Distributions to Class 8* | 25 |
| | *7.3.6   Delivery of Distributions by Debtor* | 25 |
| | *7.3.7   Reserves for Disputed Claims* | 25 |
| | *7.3.7.1   Amount of Reserves* | 25 |
| | *7.3.7.2   Held in Trust* | 26 |
| | *7.3.7.3   Release of Reserves from Disputed Claims Reserve Account* | 26 |
| | *7.3.8   Unclaimed Distributions* | 26 |
| | *7.3.8.1   Safeguarding of Unclaimed Distributions* | 26 |
| | *7.3.8.2   Release of Unclaimed Distributions* | 26 |
| | *7.3.9   Form of Distributions* | 26 |
| | *7.3.10 Rounding* | 27 |
| | *7.3.11 Disputed Payment* | 27 |
| | *7.3.12 De Minimus  Distributions* | 27 |
| *7.4* | *Means of Cash Payment* | 27 |
| *7.5* | *Time Bar to Cash Payments* | 27 |
| *7.6* | *No Distributions Pending Allowance* | 27 |
| *7.7* | *Distributions After Allowance* | 27 |

**ARTICLE 8  –  SELECT OTHER PROVISIONS OF THE PLAN** ......................28
   *8.1*    *Corporate Authority* ..............................................................28
   *8.2*    *Injunctions* ..........................................................................28
   *8.3*    *Discharge*............................................................................28
   *8.4*    *Conditions to Confirmation* ...............................................28
   *8.5*    *Governing Law* ....................................................................29
   *8.6*    *Modification of Plan* ...........................................................29
   *8.7*    *Severability* .........................................................................29
   *8.8*    *U.S. Trustee Quarterly Fees* ...............................................29
**ARTICLE 9  –  LIQUIDATION ANALYSIS** ...........................................29
**ARTICLE 10  –  OTHER LITIGATION** ...................................................30
   *10.1*   *Bankruptcy Causes of Action* .............................................30
       *10.1.1 Preferences* ...............................................................30
       *10.1.2 Fraudulent Transfers* ................................................31
       *10.1.3 Potential Litigation* ...................................................31
   *10.2*   *Pre-Bankruptcy Lawsuits* ...................................................31
   *10.3*   *Plan Treatment of Lawsuits*.................................................31
**ARTICLE 11  –  MANAGEMENT OF REORGANIZED DEBTOR**.................31
**ARTICLE 12  –  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**...........32
   *12.1*   *General* ...............................................................................32
   *12.2*   *IRS Circular 230 Disclosure* ..............................................33
   *12.3*   *Consequences to Holders of Claims*....................................33
       *12.3.1 Realization and Recognition of Gain or Loss  in General* ......................33
       *12.3.2 Accrued Interest* .......................................................34
       *12.3.3 Withholding* ..............................................................34
   *12.4*   *Consequences to Debtor or Reorganized Debtor - Discharge of*
       *Indebtedness Income Generally* ...........................................34
**ARTICLE 13  –  REQUIREMENTS FOR CONFIRMATION OF THE PLAN**................35
   *13.1*   *General Confirmation Requirements* ...................................35
   *13.2*   *Potential Cramdown of the Plan* .........................................36
**ARTICLE 14  –  CONCLUSION** ............................................................37

## ARTICLE 1 – INTRODUCTION

### *1.1    Preliminary Statement*

On June 26, 2008 (the "*Petition Date*"), Texas Standard Oil Company, a Texas corporation ("Debtor") filed its voluntary petition under chapter 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "*Court*"). The case has been pending since that time before the Honorable Jeff Bohm, United States Bankruptcy Judge. Since the Petition Date, the Debtor has operated as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code ("*Bankruptcy Case*").

This Disclosure Statement ("*Disclosure Statement*") is submitted by the Debtor pursuant to section 1125 of the Bankruptcy Code in connection with the Debtor's Plan of Reorganization (the "*Plan*"). A copy of the Plan is attached to this Disclosure Statement as *Exhibit "A"*. For purposes hereof, any term used in this Disclosure Statement (regardless of capitalization), and not otherwise separately defined herein, shall have the defined meaning ascribed to it in the Plan or in section 101 of the Bankruptcy Code.

On _____, after notice and a hearing, the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the classes of claimants and stockholders entitled to vote pursuant to the Plan to make an informed judgment on whether to accept or reject the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

**OTHER THAN THIS DISCLOSURE STATEMENT, NO STATEMENT OR INFORMATION GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN HAS BEEN APPROVED BY THE COURT CONCERNING: (1) THE DEBTOR AND ITS BUSINESS, ASSETS OR PROPERTY; (2) THE REORGANIZED DEBTOR AND THE PROJECTED RESULTS OF ITS FUTURE BUSINESS OPERATIONS AND FINANCIAL CONDITION; OR (3) DISTRIBUTIONS TO BE MADE UNDER THE PLAN. YOU SHOULD USE CAUTION IN CONSIDERING ANY STATEMENT OR INFORMATION IN MAKING YOUR VOTING DECISION BASED UPON INFORMATION NOT CONTAINED HEREIN.**

**ANY ADDITIONAL REPRESENTATIONS OR INDUCEMENTS MADE TO YOU BY ANY PARTY OTHER THAN THE DEBTOR AND ITS PROFESSIONALS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, DAVID ASKANASE, ESQ., HUGHESWATTERSASKANASE, LLP, 333 CLAY, 29TH FLOOR, HOUSTON, TEXAS 77002.**

**THE STATEMENTS AND THE FINANCIAL INFORMATION ABOUT THE DEBTOR AND/OR THE REORGANIZED DEBTOR, INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS AND INTERESTS**

CONTAINED HEREIN, HAVE BEEN PREPARED FROM THE DEBTOR'S BOOKS AND RECORDS. WHILE THE DEBTOR BELIEVES THE INFORMATION TO BE ACCURATE AND COMPLETE, THE DEBTOR AND ITS PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIM ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT OR OTHER DATE SPECIFIED AND THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTOR AND THE REORGANIZED DEBTOR AND CERTAIN OTHER FORWARD–LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. *SEE* ARTICLE 5, "RISK FACTORS." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD–LOOKING STATEMENTS.

### 1.2     Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor to enable the holders of impaired Claims and Interests against the Debtor to make an informed decision with respect to acceptance or rejection of the Plan. This Disclosure Statement should be read in its entirety prior to voting on the Plan. This Disclosure Statement describes various transactions contemplated under the Plan. No solicitation of any vote for or against the Plan may be made except as is consistent with this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor or its business other than the information contained in this Disclosure Statement. Each Creditor, Interest Holder or other party in interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and to consult legal or other counsel, if necessary, to understand the Plan and its effects, including possible tax consequences, before voting.

## 1.3    Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Upon the commencement of a chapter 11 case, section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect upon claims against a debtor that arose prior to the bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Under chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor and its creditors and stockholders. Confirmation of a plan of reorganization is the primary purpose of a reorganization case under chapter 11 of the Bankruptcy Code. A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Generally, a claim against a debtor arises from a normal debtor/creditor transaction, such as a promissory note or a trade credit relationship, but may also arise from other contractual arrangements or from alleged torts. An interest in a debtor is held by a party that owns all or part of the debtor, such as a stockholder.

After a plan of reorganization has been filed with a bankruptcy court, it must be accepted by holders of impaired claims against, or interests in, the debtor. Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose sufficient information about the debtor, its assets and the plan of reorganization to creditors and stockholders before acceptances of that plan may be solicited. This Disclosure Statement is being provided to the holders of Claims against, or Interests in, the Debtor to satisfy such requirements of section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that creditors and stockholders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class. While courts have disagreed on the proper method to be used in classifying creditors and stockholders, a general rule of thumb (which is subject to exceptions) is that creditors with similar legal rights are placed together in the same class and that stockholders with similar legal rights are placed together in the same class. For example, all creditors entitled to priority under the Bankruptcy Code might be placed in one class, while all creditors holding subordinated unsecured claims might be placed in a separate class. Generally, each secured creditor will be placed in a class by itself, because each such creditor usually has a lien on distinct property and, therefore, has distinct legal rights.

The Bankruptcy Code does not require that each claimant or stockholder vote in favor of a plan for the Court to confirm a plan. Rather, a plan must be accepted by each class of claimants and stockholders (subject to the exception discussed below). A class of claimants accepts a plan if, of the claimants in the class who actually vote on a plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claims is $1,000,000.00, then for such class to have accepted the plan, six or more of those creditors must have voted to accept the plan (a simple majority), and the claims of the creditors voting to accept the plan must total at least $666,667.00 (a two-thirds majority).

The Court may confirm a plan even though fewer than all classes of claims and interests vote to accept the plan. In this instance, the plan must be accepted by at least one "impaired" class of claims, without including any acceptance of the plan by an insider. Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a claim as to which legal, equitable or

contractual rights are altered under a plan is deemed to be "impaired." Under this Plan, all Classes except Classes 7 and 8 are not impaired.

If all impaired Classes of Claims and Interests under the Plan do not vote to accept the Plan, the Debtor is entitled to request that the Court confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. These "cramdown" provisions permit a plan to be confirmed over the dissenting votes of classes of claims and/or interests if at least one impaired class of claims votes to accept a plan (excluding the votes of insiders) and the Court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting class of claims and interests.

Independent of the acceptance of a plan as described above, to confirm a plan, the Court must determine that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. *See*, infra, "Requirements for Confirmation of the Plan," Article 13, for a discussion of the section 1129(a) requirements for confirmation of a plan of reorganization.

### THE DEBTOR BELIEVES THAT THIS PLAN SATISFIES EACH OF THE CONFIRMATION REQUIREMENTS OF SECTION 1129(a) AND, IF NECESSARY, OF SECTION 1129(b) OF THE BANKRUPTCY CODE.

Confirmation of the Plan makes the Plan binding upon the Debtor, the Reorganized Debtor, Creditors, stockholders and other parties in interest irrespective of whether they have filed proofs of Claim or proofs of interest or voted to accept the Plan.

### 1.4    *Procedure for Filing Proofs of Claim and Proofs of Interest*

#### 1.4.1    *Bar Date for Filing of All Proofs of Claim (Other Than Administrative Claims) and Proofs of Interest*

To participate in the payments and other distributions under the Plan, a Creditor must have an Allowed Claim against, and an Interest Holder must have an Allowed Interest in, the Debtor. The first step in obtaining an allowed claim or an allowed interest is generally filing a proof of Claim or proof of interest.

A proof of Claim or proof of interest is deemed filed for any Claim or Interest that appears in the Schedules which were filed in the Chapter 11 Case, except a Claim or Interest that is scheduled as disputed, contingent, unliquidated or in an unknown amount. In other words, if a Creditor or Interest Holder agrees with the amount of the Claim or Interest as scheduled by the Debtor, and that Claim or Interest is not listed in the Schedules as being disputed, contingent or unliquidated, it is not necessary that a separate proof of Claim or proof of interest be filed.

Claims or Interests that are unscheduled, or which are scheduled as disputed, contingent or unliquidated, or which are scheduled in an amount that varies from the amount claimed by the Creditor or Interest Holder shall be recognized and allowed only if a proof of Claim or proof of interest was timely filed.

The Bar Date to file proofs of claims in this Bankruptcy Case was October 29, 2008.

### 1.4.2    Effect of Amendments to Schedules

If the Debtor amends downward any Claim or Interest shown on the Schedules, the affected Creditor or Interest Holder will be notified and will be given 30 calendar days from the date of the mailing of such notice to file a proof of Claim or proof of interest if the affected Creditor or Interest Holder so desires.

### 1.4.3    Executory Contracts and Unexpired Leases

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be filed with the Bankruptcy Court by (i) the earlier of (a) the Bar Date, (b) thirty (30) days after entry of the Confirmation Order, or (c) such other date as is set by the Bankruptcy Court in the order rejecting the executory contract or unexpired lease or (ii) if an order rejecting an executory contract or unexpired lease is entered by the Bankruptcy Court after the Bar Date, not later than the thirtieth (30th) day after the date of entry of such order (including the Confirmation Order) approving such rejection. Holders of such Claims who fail to file proofs of claim within such deadline(s) shall be forever barred from asserting such Claims against the Debtor and Reorganized Debtor, including the Estates or properties of the Debtor and Reorganized Debtor, unless otherwise ordered by the Bankruptcy Court or provided for in the Plan. Claims arising from the rejection of executory contracts or unexpired leases that become Allowed Claims shall be classified and treated as Class 7 General Unsecured Claims.

## 1.5    Voting Procedures and Requirements

### 1.5.1    Persons Entitled to Vote

The Debtor is soliciting acceptances of the Plan from the holders of Claims in Classes 7 and 8. Classes 7 and 8 are impaired under the Plan. The holders of Claims classified in Class 1, 2, 3, 4, 5, 6 and 9 are not entitled to vote under the Plan, as such holders are not impaired under the Plan.

Any Claim as to which an objection is filed before voting has concluded is not entitled to vote, unless the Court, upon application or motion of the holder whose Claim has been objected to, temporarily allows the Claim in an amount that the Court deems proper for the purpose of voting to accept or reject the Plan. A vote may be disregarded or disallowed if the Court determines that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 1.5.2    Voting Instructions

#### 1.5.2.1    Ballots

A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement for Creditors and Equity Interest holders entitled to vote. Creditors and Equity Interest holders must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return the executed ballot to the address indicated thereon by the deadline to enable the ballot to be considered for voting purposes.

**IT IS IMPORTANT THAT CREDITORS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.** All known Creditors entitled to vote on the Plan have been sent a ballot with this Disclosure Statement. Creditors should read the ballot carefully and follow the instructions contained therein. In voting for or against the Plan, use only the ballot or ballots sent with this Disclosure Statement.

The Bankruptcy Court has directed that, in order for a particular ballot to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received at the address specified below by no later than the deadline specified below for the Classes of claims and Equity Interests identified:

**CLASS 7 -  ALLOWED GENERAL UNSECURED CLAIMS**
**BALLOT FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION**

**CLASS 8 – ALLOWED CLAIMS RELATED TO HIGH ISLAND A-96**
**BALLOT FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION**

**THE VOTING DEADLINE IS _____, ___ __.M., CENTRAL TIME. ALL BALLOTS MUST BE RETURNED SO THAT THEY ARE RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE.**

**THE NAME AND ADDRESS OF THE BALLOTING AGENT IS SET FORTH ON THE BALLOT AND BELOW:**

**Heather McIntyre, Esq.**
**HughesWattersAskanase, LLP**
**Three Allen Center**
**333 Clay Street, 29th Floor**
**Houston, Texas 77002**

**AGAIN, IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

### 1.5.2.2    *Incomplete or Irregular Ballots*

Ballots that fail to provide the information to determine the Class to which they apply shall be counted, subject only to contrary determinations by the Court, in the Class determined by the Debtor. Ballots that are signed and returned but not expressly voted either to accept or reject the Plan will be counted as a vote to accept the Plan.

### 1.5.2.3    *Ballot Retention*

Original ballots will be retained by the Debtor for six months following the Confirmation Date.

### 1.5.3   Approval of Disclosure Statement

On _____, the Court approved this Disclosure Statement as containing adequate information in accordance with section 1125 of the Bankruptcy Code. A copy of the "Order (i) Approving Disclosure Statement; (ii) Approving Solicitation Package; (iii) Approving Procedures for Distribution of Solicitation Package; (iv) Approving Form of Ballot; (v) Establishing Last Date for Receipt of Ballot; (vi) Approving Procedures for Vote Tabulation; (vii) Establishing Procedures and Deadline to File Objections to Confirmation of Plan; and (viii) Approving Form and Manner of Notice of Confirmation Hearing of Related Issues" is attached as *Exhibit "B"* to this Disclosure Statement.

### 1.5.4   Confirmation Hearing

The Court has set the Confirmation Hearing for _____.m., Central Time, on _____, in the courtroom of the Honorable Jeff Bohm, United States Bankruptcy Judge for the Southern District of Texas, Houston Division, United States Courthouse, 515 Rusk, Courtroom 600, Houston, Texas 77002. The Confirmation Hearing may be adjourned by the Court from time to time without further notice except for an announcement made in open court at the Confirmation Hearing or any continued hearing thereon.

### 1.5.5   Objections

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object, in writing, to confirmation of a plan of reorganization. Written objections to confirmation of the Plan, if any, must be filed with the Court *and* a copy of such written objections must be *actually* received by counsel for the Debtor at the following address on or before 4:30 p.m., Central Time, on - _____:

**Heather McIntyre, Esq.**
**HughesWattersAskanase, LLP**
**Three Allen Center**
**333 Clay Street, 29th Floor**
**Houston, Texas 77002**

**Objections not timely filed and *actually received* by counsel at the above address will not be considered by the Court.**

### ARTICLE 2  –  BACKGROUND OF THE DEBTOR AND ITS BUSINESS

### 2.1   Introduction to Plan of Reorganization

The Debtor's Plan involves paying creditors from Debtor's current income streams. Debtor will pay undisputed creditors from the Debtor's current income over time. Funds from the Debtor's income streams will be escrowed for disputed claims. Debtor believes the majority of the disputed claims will be resolved upon resolution of an appeal currently pending before the Fifth Circuit Court of Appeal.

## 2.2    Background About the Debtor

This section of the Disclosure Statement describes the general background of the Debtor. As noted above, any term used in this Disclosure Statement (regardless of capitalization), and not otherwise separately defined herein, shall have the defined meaning ascribed to it in the Plan or in section 101 of the Bankruptcy Code.

### 2.2.1   Incorporated Information

The Debtor was incorporated on or about March 27, 2001 in the State of Texas and offices at Nine Greenway Plaza, Suite 2040, Houston, Texas 77046.

### 2.2.2   Business

Texas Standard Oil Company was formed in early 2001. On October 11, 2001 the Debtor purchased a set of offshore oil and gas properties from IMC Global, Inc. and an overriding royalty interest burdening the properties from the Freeport-McMoran Oil & Gas Royalty Trust in which the Chase Manhattan Bank acted as Trustee. In addition to cash paid for the properties, the Debtor agreed after closing of the sale to make an exchange offer of 36% of the total outstanding shares of the Debtor to the unitholders of the Freeport-McMoran Oil & Gas Royalty Trust ("Unitholders"). The Debtor agreed to file a registration statement relating the Exchange Offer with the Securities Exchange Commission (the "SEC") and upon effectiveness of the registration statement, to make the Exchange Offer. The offer contained a minimum condition that the Debtor's obligation to exchange shares of its common stock would be subject to the condition that Unitholders holding at least 50% of the total Units outstanding tender their Units for exchange. The Unitholders tendered less than 30% of the total Units outstanding and the Debtor retained all of its shares and remained a privately owned company.

The Debtor acquired a portion of three (3) offshore properties in the transaction. The properties were West Cameron Block 498, operated by El Paso Production Company, West Delta 34 and High Island 552, both operated by Forest Oil Corporation. All of the properties are located in the federal waters of the Gulf of Mexico. The Debtor enjoyed substantial cash flow from West Cameron 498 while the other properties were only marginal.

In September 2003, the Debtor participated in a successful, high gas flow rate recompletion on its West Cameron 498 property. Until late in 2003, the Debtor had not been actively drilling but had participated in several workovers and recompletions on its West Cameron 498 property and had a substantial cash balance. In the fall of 2003 it was determined that the Debtor should attempt to grow its reserve base by participating in drilling ventures with other companies and began doing so in December of 2003.

Between 2001 and 2008, the Debtor participated in the drilling of 28 wells. Of the 28 wells, 7 wells were completed and resulted in production revenue. Of the 7 completed wells, 3 wells produced enough to pay their respective drilling and completion costs. None of the productive wells were highly successful as they made little contribution toward covering all of the costs of the dry holes.

The drilling prospects were located in South Texas, South Louisiana, Offshore Gulf of Mexico, West Texas and New Mexico. All of the drilling prospects were originated by successful geologists with proven track records. The 28 wells were operated by 12 different operators being a mix of large publicly traded companies to small privately held companies, all of which have a history of successful operating experience.

The Debtor typically risked between 3% than 5% of its cash reserves for any single well (prospect and dry hole cost). This risk allocation was usually less than the Debtor's net cash flow in a single month at that time and it assumed a cost overrun factor of approximately 33%. Over the period that the Debtor committed to drilling projects, oil and gas prices were rising and rigs were increasingly difficult to obtain on short notice. The Debtor and its partners had to wait as long as a year to obtain a drilling rig on some of the prospects that it had committed to drill. While having to wait, the cost of drilling goods and services doubled in some instances. Further aggravating budgeting and risk exposure were the significant cost overruns caused by the chronic occurrence of mechanical drilling problems. The drilling efficiency problems were largely caused by the rapid introduction of new drilling rigs, newly fabricated drilling equipment and inexperienced personal being deployed in the oilfield.

The delay in obtaining drilling rigs, rising costs and chronic mechanical drilling problems often resulted in a final dry hole cost of 200% to 300% of the original risk commitment. Of the 28 wells that the Debtor participated in, it is estimated that only 2 or 3 were finished at or below the original cost commitment with the other 25 or 26 drilling projects finishing at 150% to 400% of the original cost commitment.

It is estimated that the Debtor spent approximately 59 % of its gross revenue from inception to date on drilling, completion, operating expenses, and plugging and abandonment of oil and gas projects. In contrast, the owners of the Debtor received less than 7.5 % of the Debtor's gross revenue in distributions from inception to date and an average salary per owner, per year of $48,000 between 2001 and 2007. The owners have loaned the Debtor cash which has not been paid back to the owners and made voluntary capital contributions to the Debtor since filing chapter 11.

### 2.2.3   Assets of the Debtor

Following is a brief description of the assets owned by the Debtor, reflecting the book value of the assets scheduled by the Debtor as of the Petition Date. The book value is not determinative of actual value as of the date of this Disclosure Statement.

1.  Cash. As of the Petition Date, the Debtor had cash on hand or on deposit totaling $37,874.01.

2.  Accounts Receivables. As of the Petition Date, the Debtor had accounts receivable totaling $3,178.86.

3.  Note Receivables. As of the Petition Date, the Debtor had note receivables totaling $546,656.28.

4.    Real Property. As of the Petition Date, the Debtor had real property totaling $2,449,693.99. The real property consists of interests in oil and gas leases. The values given are based on funds expended on each interest including leasehold cost, lease and well equipment, drilling costs and lease operating expenses. The fair market value of the real property may be significantly lower or higher than the values assigned to these interests.

5.    Appeal. As of the Petition Date, the Debtor was involved with an appeal valued at $2,000,000 which is further described in Section 3.1.

6.    Miscellaneous. As of the Petition Date, the Debtor had miscellaneous property with book values totaling approximately $50,263.78, including a rent deposit, seismic data, lease and well equipment and office lease improvements.

7.    Brazos Block 488. Per the Court's order concerning the Nominee Agreement related to Brazos Block 488 [Docket No. 82], the Debtor has a 0.3333% override interest in Brazos Block 488 as set forth in the Nominee Agreement further described in Section 3.1.

## ARTICLE 3 – PROCEEDINGS IN THE CHAPTER 11 CASE

The Debtor filed for protection under chapter 11 of the Bankruptcy Code on June 26, 2008 (hereinafter commonly referred to as the "Petition Date"). The case was assigned to the Honorable Jeff Bohm, United States Bankruptcy Judge for the Southern District of Texas, Houston Division, on the same day.

### 3.1    Events Leading to Bankruptcy and Administration of the Case

As with all chapter 11 cases of this type, the Debtor coordinated the administration of the Case by the pursuit of a number of motions designed to provide for the protection of the due process rights of the parties in interest to the bankruptcy while, at the same time, minimizing cost to the estate.

In addition to the necessary filings required in a Chapter 11 case, the Debtor filed various pleadings to advance the case given the various issues in the case, which are described as follows.

### Forest and Mariner's Faulty Accounting

The Debtor's predecessor initiated a suit against Forest Oil Corporation based on faulty accounting which resulted in millions of dollars in adjustments in the predecessor's favor. In 2005, the Debtor brought a similar suit based on the same faulty accounting that Forest Oil Corporation continued as further described below. The jury found in favor of the Debtor as to the proper accounting method. Based on information and belief, Mariner continues to engage in improper accounting despite the February 2008 judgment in the Debtor's favor on this matter.

Mariner and Forest contend that they were the prevailing parties in the Mariner Lawsuit. Mariner and Forest contend that the jury did not make a finding regarding accounting methods.

Mariner and Forest contend that their accounting methods are proper. Mariner further contends that accounting is not relevant because High Island 552 has not produced for some time.

## Pending Fifth Circuit Appeal

Pre-petition, a judgment was entered in Case No. G-05-490 *Texas Standard Oil Company v. Forest Oil Corporation, et al.* in the United States District Court for the Southern District of Texas, Houston Division (the "Mariner Lawsuit").[1] The Debtor initiated the Mariner Lawsuit based on Mariner's faulty accounting resulting in the Debtor receiving less than what it was entitled to under two joint operating agreements. One of the properties, High Island 552, was the subject of a prior audit culminating in a 1999 agreement concerning the allocation issues. Forest/Mariner systematically ignored the 1999 agreement. The jury verdict in the underlying trial vindicated Debtor's position. Forest/Mariner continue to systematically misallocate expenses regarding West Delta 34. The other property at issue in the Mariner Lawsuit is located offshore Louisiana and is known as the West Delta 34 property. Forest Oil Corporation ("FOC"), Mariner Energy Resources, Inc. ("MER"), Mariner Energy, Inc. ("MEI"), Apache Corporation ("AC"), Noble Energy, Inc. ("NEI"), and Coldren Resources, L.P. ("CR") filed counterclaims against Debtor.

Essentially, the Debtor prevailed on the accounting issue. The District Court denied the majority of the non-Debtors' claims. The court assessed operating costs against the Debtor and found that the Debtor forfeited its interest in the West Delta 34 lease.

On January 3, 2008, the District Court ruled on multiple motions for summary judgment filed by the Debtor, FOC, MER, MEI, NEI and CR [Case No. G-05-490, docket no. 123] ("MSJ Order"). AC did not seek a summary judgment. The District Court denied the Debtor's motion for summary judgment. The District Court entered an order granting, in part, the two motions for summary judgment filed by FOC, MER, MEI, NEI and CR (collectively "MSJ Movants"). The District Court granted the MSJ Movants' allegation that a penalty should be assessed against the Debtor and that any unjust enrichment received by the Debtor should be forfeited. The District Court denied the MSJ Movants' remaining allegations in the two motions for summary judgment.

The Mariner Lawsuit proceeded to jury trial and the District Court entered a final judgment on the jury trial [Case No. G-05-490, docket no. 181] ("Final Judgment"). The District Court made the following findings: (i) the Debtor owed FOC and MER a portion of the operating expenses they claimed; (ii) MER and NEI were **not** entitled to contractual damages for the alleged failure to comply with the HI 552 Gas Balancing Agreement; (iii) the Debtor did **not** wrongfully retain natural gas from MER and NEI; (iv) FOC, MER, MEI and NEI were **not** entitled to attorney's fees; and (v) as a matter of law, AC was entitled to apply the District Court's previous order on the two motions for summary judgment entered on January 3, 2008.

On March 9, 2008, FOC, MER, MEI, AC, NEI and CR timely appealed the MSJ Order, Final Judgment, and order denying post trial motions [Case No. G-05-490, docket no. 196]. On April 10,

---

1   In the Mariner Lawsuit, Forest Oil Corporation ("FOC"), Mariner Energy Resources, Inc. ("MER"), Mariner Energy, Inc. ("MEI") (collectively, "Mariner"), Apache Corporation ("AC"), Noble Energy, Inc. ("NEI"), and Coldren Resources, L.P. ("CR") filed counterclaims against the Debtor.

2008, the Debtor cross-appealed the MSJ Order, Final Judgment, and order assessing costs against the Debtor in favor of FOC, MER, and MEI [Case No. G-05-490, docket no. 197]. The style of the Mariner Lawsuit on appeal in the Fifth Circuit Court of Appeals is Case No. 08-40390; *Texas Standard Oil Company v. Forest Oil Corporation, et al.* (the "Appeal").

The Debtor filed its Notice of Suggestion of Bankruptcy in the Appeal on or about July 17, 2008. Per the Fifth Circuit's request, the Debtor filed monthly status reports with the Fifth Circuit until the briefing schedule was issued on or about October 21, 2008.

On July 25, 2008, FOC, MEI and MER moved in the Bankruptcy Court for relief from the automatic stay to allow the Appeal to proceed [Docket No. 25]. The Debtor did not oppose the relief sought provided that the Court granted the Debtor's application to employ special counsel for purposes of continuing the Appeal. The Court granted the Debtor's application to employ special counsel on August 7, 2008 [Docket No. 26]. On August 7, 2008, the Bankruptcy Court granted the motion for relief from stay and entered its Order Granting Unopposed Motion for Relief from the Automatic Stay [Docket No. 27] (the "Lift Stay Order").

On August 13, 2008, the Debtor filed a notice regarding the status of the bankruptcy case attaching a copy of this Court's Lift Stay Order lifting the automatic stay with the Fifth Circuit. After filing this notice with the Fifth Circuit Court of Appeals, Debtor and counsel for FOC/MER/MEI were contacted by a Clerk with the Fifth Circuit Court of Appeals who requested that the parties seek to lift the stay as to AC, NEI and CR. The Debtor moved to lift the stay as to these additional parties which the Bankruptcy Court granted on October 16, 2008 [Docket No. 79].

On or about October 21, 2008, the Fifth Circuit issued a briefing schedule requiring appellant-cross-appellees' briefs (the non-Debtor parties) by December 1, 2008. The Debtor agreed to an extension requested by the non-Debtor parties to file their brief by December 15, 2008.

Debtor continues to pursue the Appeal for the benefit of its creditors. The Debtor contends the Appeal is a significant asset to the estate. Should the Debtor prevail on appeal, the claims of one of the Debtor's largest creditors, FOC/MER/MEI, will be significantly reduced, if not eliminated. The FOC/MER/MEI proofs of claims together total $6,716,112.78 as filed in contrast to their judgments totaling $460,323.21.

In addition, assuming that the Fifth Circuit enforces the accounting proposed by the Debtor related to the West Delta 34 property and implicitly adopted by the jury in the Final Judgment, the Debtor should begin to receive income from the West Delta 34 property in addition to possible turnover of funds held by Mariner due to its continued improper accounting. As set forth in its schedules, the Debtor bases its $2 million value of the Appeal on a greater than 50% chance of prevailing on the Appeal and the future production from the oil and gas interests which are the subject of the Appeal, and a decrease in alleged liabilities owed. As set forth in its schedules, this valuation is an educated estimate and the ultimate value of the Appeal could be much higher or much lower than $2 million.

Mariner and Forest contend that the Appeal is not an asset of the estate because even if the Debtor prevailed and owned an interest in West Delta 34, the Debtor would owe the associated

operating costs which would result in the Debtor owing Mariner and Forest. Mariner and Forest further contend there was no ruling on an accounting issue. Mariner and Forest contend that if they win the Appeal and a new trial is granted and they then win that trial, the Debtor will owe more than $1 million for operating expenses through December 31, 2007.

As is the nature of litigation and the court system, the timeline for when the Appeal will be resolved is unknown and the outcome highly speculative. As set forth above, the briefing schedule required initial briefs from Mariner and Forest by December 1, 2008 which Debtor agreed to extend to December 15, 2008. Per the FAQs on the Fifth Circuit's website, the Fifth Circuit attempts to reach a decision within 60 days after the case has been fully briefed and submitted to the court. Overall, the average is about 10 months between filing a notice of appeal and a decision.[2]

Mariner and Forest contend that if the Debtor prevails on the Appeal, a new trial may be necessary that could take years to resolve. Mariner and Forest contend that if they prevail, additional, rather limited proceedings will be required. In the event that Mariner prevails on the Appeal and obtains a higher judgment, then the payout to unsecured creditors will likely be diminished.

## Thumbs Up Prospect

Post-petition, a cash call for drilling the Thumps Up Prospect[3] became due based on a drilling rig becoming available. At the time the cash call became immediately due, the Debtor did not have the ability to meet the cash call. The Debtor proposed to sell 75% of its interest in the Thumbs Up Prospect for cash and an agreement that the acquiring entities would make this and all future cash calls relating to the drilling of the Test Wells until payout of the Test Wells [Docket No. 31]. FOC/MER/MEI objected and the Court denied the Debtor's motion orally on August 14, 2008 and an order denying the motion was entered on August 26, 2008.

To preserve the Debtor's interest in the Thumbs Up Prospect for the benefit of creditors, Debtor's shareholders made capital contributions totaling $50,000 on August 19, 2008 to enable the Debtor to meet the cash call. Drilling commenced on the Thumbs Up Prospect on or about September 17, 2008. On or about October 17, 2008, it was determined that the drilling produced a dry hole. Therefore, the Debtor believes that the Thumbs Up Prospect will not fund a plan of reorganization as the Debtor originally hoped as the Debtor had originally expected this prospect to generate $3 to $4 million.

## Nominee Agreements

As listed on the Debtor's Statement of Financial Affairs [Docket No. 17], the Debtor held an offshore federal lease identified as Brazos Block 488 on behalf of Buccaneer Resources, LLC ("Buccaneer") and Highbaugh Field Corporation ("Highbaugh") per a Nominee Agreement. At the meeting of creditors held July 31, 2008, counsel for Forest Oil Corporation, Mariner Energy, Inc. and

---

2  *See* http://www.ca5.uscourts.gov/clerk/docs/Faqs.pdf

3  Debtor owns a participation interest in a prospect known as "Thumbs Up" that is identified on Debtor's Schedule A [Docket No. 16] as an undivided leasehold interest in the "Catapult Trend Area, Cameron, Vermilion and Iberia Parishes" in Louisiana (hereinafter referred to as "Thumbs Up Prospect").

Mariner Energy Resources, Inc. (collectively "Mariner") indicated a desire to conduct third party discovery regarding the Nominee Agreement. As such, the Debtor delayed filing its Motion for Authority to Perform Under Pre-Petition Nominee Agreement Regarding Brazos Block 488 [Docket No. 55] until September 25, 2008 ("Brazos Block Motion"). In the interim, based on information and belief, Mariner gathered discovery from five third-parties. The Debtor did not receive copies of this third-party discovery until on or about October 10, 2008. The Court granted Debtor's Brazos Block Motion on October 17, 2008.

After the meeting of creditors, Debtor discovered that it had inadvertently omitted an additional nominee agreement concerning an offshore federal lease identified as High Island A-96. The Debtor amended its Statement of Financial Affairs on August 22, 2008 [Docket No. 47] to account for this property. Due to Mariner's inquiries related to Brazos Block 488, the Debtor delayed filing its Motion for Authority to Perform Under Pre-Petition Nominee Agreement Regarding High Island A-96 [Docket No. 56] until September 25, 2008 ("HI A-96 Motion"). The hearing on the HI A-96 Motion occurred over three days. The Court denied the HI A-96 Motion on November 12, 2008, and issued an opinion regarding same.

The Plan proposes to transfer the interest in HI A-96 in exchange for consideration. Mariner and Forest contend that the interest cannot be transferred due to the Court's November 12, 2008 order.

### 3.1.1   Non-Residential Real Property Leases

In the wake of Hurricane Ike, the Debtor filed its *Motion of Texas Standard Oil Company To Extend Time To Assume or Reject Lease* [Docket No. 51] on September 19, 2008, which the Court granted on October 16, 2008 [Docket No. 80].

### 3.1.2   Appointment of Committee of Unsecured Creditors

No unsecured creditors committee was appointed in the Debtor's case.

### 3.1.3   Retention of Professionals

At the commencement of the case, the Debtor retained HughesWattersAskanase, LLP as Debtor's bankruptcy counsel. HughesWattersAskanse, LLP filed its application to be employed by the Debtor as bankruptcy counsel [Docket No. 11] which the Court granted on July 14, 2008. The Debtor filed its motion to employ The Kim Law Firm as special counsel to assist the Debtor in the pending case on appeal with the Fifth Circuit [Docket No. 22], which the Court granted on August 7, 2008. As set forth in the application, The Kim Law Firm was hired on a 15% contingency fee basis and its fees are subject to Bankruptcy Court approval. Debtor also filed a motion to employ Debtor's outside accountant which the Court granted on August 18, 2008 [Docket No. 39].

### 3.1.4   341 Meeting

A meeting pursuant to Section 341 of the Bankruptcy Code was held in Houston, Texas on July 31, 2008.

### 3.1.5   *Assumption and Rejection of Executory Contracts and Leases*

Attached as *Exhibit "H"* hereto is a list of the unexpired leases and executory contracts and/or leases that are to be assumed as obligations of the Reorganized Debtor under the Plan. The Order of the Court confirming the Plan shall constitute an Order approving the assumption and assignment of each lease and contract to the Reorganized Debtor ("Assumed Contracts").

**If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Section 1.5.5 of the Disclosure Statement for the specific date.**

Any uncontested monetary defaults under each executory contract or unexpired lease to be assumed under the Plan will be satisfied, pursuant to Section 365 of the Bankruptcy Code, by payment of the default amount in equal quarterly cash installments commencing on the Effective Date and continuing for one (1) year. There are no uncontested monetary defaults at this time.

The Bankruptcy Court expressly reserves exclusive jurisdiction over any dispute related to the assumption, assignment and enforceability of the Assumed Contracts. It should be noted that certain of the Assumed Contracts may have anti-assignment provisions contained therein. Please be advised that the reorganized Debtor takes the position that such provisions are not enforceable and are invalid as a matter of law. *See* U.S.C. Section 365(f) and *In re Lil' Things, Inc.*, 220 B.R. 583 (Bankr. N.D. Tex. 1998).

### 3.2   **Claims Process and Bar Date**

The Debtor filed with the Bankruptcy Court its schedules of assets and liabilities and statements of financial affairs on July 11, 2008. The Bankruptcy Court established October 29, 2008 (the "Bar Date") as the deadline for filing proofs of Claim, except with respect to certain specified Governmental Claims and Rejection Claims, against the Debtor.

The Debtor will review and analyze all Claims asserted against it. Each Proof of Claim and Proof of Interest will be analyzed to determine whether to object to the allowance of such Claims or Interests.

The Claims asserted against the Debtor are in excess of the total amount of Allowed Claims estimated by the Debtor in development of the Debtor's Plan because, among other things, certain Claims: (i) assert contingent Claims; (ii) consist of claims subject to litigation; (iii) are asserted in excess of the amount actually owed; (iv) consist of claims related to the Appeal; and/or (v) include postpetition interest and other disallowable charges.

The Debtor intends to file objections to, among others, those Claims that are:

        (A)     duplicative;
        (B)     superseded by amended Claims;
        (C)     not obligations of the Debtor;
        (D)     contingent;

      (E)     estimated;

      (F)     filed after the Bar Date; and/or

      (G)     in excess of the amount actually owed, as evidenced by the Debtor's books and records.

Debtor in no way waives any further objections to claims not described herein. Debtor reserves all rights and claims it may have in objecting to any and all proofs of claims.

The Debtor projects that the Claims asserted against it will be resolved and reduced to an amount that approximates the Debtor's estimates of Allowed Claims contained in this Disclosure Statement. However, the actual aggregate amount of Allowed Claims in any Class may differ significantly from the Debtor's estimates thereof and any variance from such estimates will affect Distribution in certain Classes.

Specifically, the Debtor intends to object to the claim of Forest Oil Corporation. As filed, FOC's claim is currently $878,153.43. However, FOC's judgment is only $32,007.21 and the jury specifically denied the recovery which FOC is now seeking via its proof of claim.

Additionally, the Debtor intends to object to the claim of MER/MEI. As filed, Mariner's claim is currently $6,716,112.78. However, Mariner's judgment is only $428,316.00 and the jury specifically denied portions of the claims filed. Additionally, other claims appear to be duplicative of amounts included in the judgment or are not presently due and payable under the applicable contracts.

Mariner and Forest contend that their claims are not duplicative and that their claims are presently due and payable. Further, Mariner and Forest contend that they are entitled to a new trial as to the operating expenses owed and the failure of the jury to award them attorneys fees. This contention is currently before the Fifth Circuit in the Appeal. Mariner and Forest contend they are entitled to the full amount of operating expenses allegedly owed as well as their attorneys' fees. Mariner and Forest contend that if they prevail in the Appeal, the judgment amount to which they would be entitled as of December 31, 2007 would be $818,824.00 in operating expenses and attorneys' fees of approximately $650,000.

Mariner and Forest contend that claims related to plugging and abandonment of High Island 552 and WD 34 are presently due.

**ARTICLE 4 – GENERAL OVERVIEW OF**
**THE PROPOSED PLAN OF REORGANIZATION**

In general, the Plan provides that the Reorganized Debtor will continue operating and distribute income to holders of Allowed Claims. Reorganized Debtor will escrow payments to disputed creditors until their claims are allowed or disallowed. Reorganized Debtor will continue to pursue the Appeal.

The Plan contains certain other provisions that are described more completely herein and in the Plan itself.

## ARTICLE 5 – RISK FACTORS

HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

### 5.1 Business Risks

#### 5.1.1 Lack of Capital Resources

The Debtor's financial situation deteriorated primarily due to its investment in 22 dry holes over the past eight years.    In addition, the Debtor has been involved with the Mariner Lawsuit since September 2005. A final judgment was entered on February 22, 2008. Writs of execution were issued and the Debtor filed this Bankruptcy Case before the writs were executed. Debtor's current resources are limited to income streams from the Davis Trust Well located in Calcasieu Lake South Prospect, Cameron Parish, Louisiana, the Apache Well located in Main Pass Area Block 7, Offshore Louisiana, and the expected recovery on the note receivable from MOSH Holding L.P.

Debtor believes reorganization is possible based on expected payment of the MOSH Holding LP note and the income streams from the David Trust Well and Apache Well.

Mariner contends that the plan is not confirmable because the Plan does not address the contingency of Mariner prevailing on the Appeal and possibly having a judgment in excess of $1.5 million.

#### 5.1.2  Davis Trust Well

The Debtor expects to have estimated monthly income from the Davis Trust Well of approximately $7,800 from November 2008 through August 2010. Attached as *Exhibit "E"* is a projected income analysis for the Davis Trust Well.

#### 5.1.3  Apache Well

Based on an expected re-work of the Apache Well, the Debtor estimates it will receive monthly income from the Apache Well averaging approximately $33,675 from January 2009 through December 2009. Attached as *Exhibit "F"* is a projected income analysis for the Apache Well.

#### 5.1.4  Note Receivables

The Debtor holds a note receivable due from MOSH Holding L.P. As indicated in the Debtor's schedules, the face value of this note is $545,000. MOSH Holding, LP's general partner is MOSH Holding I, LLC. Tim Roberson, who owns 50% of the Debtor, is the director and managing member of MOSH Holding, LP's general partner. The note is payable on demand, or if no demand, on December 31, 2012.

MOSH Holding, LP owns approximately 10.2% of Mesa Offshore Trust per the 2007 10-K filed by Mesa Offshore Trust which is available from the U.S. Securities and Exchange Commission ("SEC") and through www.sec.gov. Mesa Offshore Trust is traded on the OTC Bulletin Board ("OTCBB") under the ticker symbol of MOSH. As of January 13, 2009, Mesa Offshore Trust was traded at or about .335 per share for a total market cap of approximately $24 million per the OTCBB's website www.otcbb.com. Ten percent of $24 million is $2.4 million. The Debtor contends that the note receivable due from MOSH Holding, L.P. is collectible from MOSH Holding, L.P. and worth approximately $560,000 with interest through December 2008.

As set forth in Mesa Offshore Trust's 2007 10-K, MOSH Holding, LP filed a lawsuit alleging various causes of action in April 2007. This suit is currently scheduled for trial in April 2009. More information concerning this lawsuit is available in Mesa Offshore Trust's 2007 10-K and other SEC filings available at www.sec.gov.

The Debtor anticipates that MOSH Holding, LP will pay the note on or before April 30, 2009.

### 5.2    *Risks Related to Projections and Estimates*

This Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Reorganized Debtor's financial position, business strategy, plans and objectives of management for future operations and indebtedness covenant compliance, including but not limited to statements using words such as "anticipates," "expects," "estimates," "believes" and "likely" are forward-looking statements.    Management believes that its current views and expectations are based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results. Important factors that could cause actual results to differ materially from those in the forward-looking statements ("Cautionary Statements") are disclosed throughout this Disclosure Statement and include, without limitation, the risk factors discussed herein, conditions in the capital markets, and competition. All written and oral forward-looking statements attributable to the Debtor, or persons acting on its behalf, are expressly qualified in their entirety by the Cautionary Statements. The Reorganized Debtor does not intend to update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

### 5.3    *Competition*

The Reorganized Debtor will have substantial competition in its future operations and retaining competent and trained personnel. Many competitors have substantially larger financial resources, staffs and facilities. If the Reorganized Debtor directly competes against one of those larger companies in its business or in the hiring of experienced and skilled personnel, it may not have the resources available to obtain the desired result. Therefore, the Reorganized Debtor must carefully select its business prospects, personnel moves and similar matters.

### *5.4    Governmental Regulation*

The Debtor's operations are affected from time to time in varying degrees by political developments and federal, state and local laws and regulations, operations and economics are or have been potentially affected by price controls, taxes and other laws. The Debtor cannot predict how existing laws and regulations may be interpreted by enforcement agencies or court rulings, whether additional laws and regulations will be adopted, or the effect such changes may have on future business, financial condition or results of operations.

### *5.5    Bankruptcy Risks*

#### *5.5.1    The Appeal*

The Appeal involves the asserted claims of Forest Oil Corporation, Mariner Energy, Inc. and Mariner Energy Resources, Inc. which total $6,716,112.78 per the filed proofs of claims. Debtor contends that it has a strong probability of prevailing on appeal. Although the non-Debtor parties have not yet filed their brief on appeal which is due by December 15, 2008, the Debtor believes the appeal is likely to involve two issues. First, the Mariner Lawsuit addressed whether the Debtor had forfeited its leasehold in West Delta 34, including the Number 12 well. The non-Debtor parties prevailed on this issue.

Second, the Mariner Lawsuit addressed the proper accounting for both High Island 552 and West Delta 34. The Debtor prevailed on this issue. Mariner and Forest contend that the Debtor did not prevail on the issue of accounting.

The non-Debtor parties sought recovery of attorneys fees but refused to segregate their attorneys fees between the forfeiture issues and the accounting issues. The jury denied the non-Debtor parties any recovery of their attorneys fees.

Debtor believes that the non-Debtor parties will likely contest the jury verdict of no recovery for attorneys fees and the acceptance of the Debtor's accounting. The Debtor contests the finding regarding forfeiture of the West Delta 34 leasehold.

In the event the Debtor prevails on appeal, the likely outcome is that the Debtor retains its interest in the Number 12 well. The effect of this is that the Debtor will likely receive approximately $400,000 in withheld revenue and future revenue estimated at $2 to $4 million. In addition, the non-Debtor parties will continue to not be entitled to attorneys fees and will be held to proper accounting. As to the existing judgments , the withheld revenue will likely offset the non-Debtors' claims in their entirety.

If the non-Debtor parties prevail, then the likely outcome is that the Debtor becomes liable for the judgment amounts and continues to not have an interest in the Number 12 well. As to the accounting, if the non-Debtor parties' accounting is adopted, then the Debtor will likely face additional judgment amounts. Mariner and Forest contend that if the non-debtor parties prevail, then the Debtor will owe a judgment amount in excess of $1.5 million.

### 5.5.2   Risk of Nonconfirmation of the Plan

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that its Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

### 5.5.3   Nonoccurrence of Effective Date of the Plan

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective. The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied. The Debtor believes that it will satisfy all requirements for consummation under the Plan. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## ARTICLE 6  –  TREATMENT OF CLAIMS WITHIN THE PROPOSED PLAN OF REORGANIZATION

**THE FOLLOWING SUMMARY OF THE PLAN IS QUALIFIED BY THE ACTUAL PROVISIONS OF THE PLAN. TO THE EXTENT THE PROVISIONS OF THE PLAN DIFFER FROM THE SUMMARY SET OUT BELOW OR DIFFER FROM ANY OTHER INFORMATION WITHIN THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

The Bankruptcy Code requires the Debtor to classify Claims asserted against its estate. The Bankruptcy Code prohibits dissimilar creditors from being placed within the same class. Except for such prohibition, the Bankruptcy Code is silent as to other guidelines to be used in classification. Generally, every secured creditor is classified within a separate class. This is necessary because a secured creditor's rights against unique collateral are generally considered to be sufficiently dissimilar from any other creditor's rights to allow for joint classification. Priority claims, except for Section 507(a)(1), (2) and (8) claims, are generally classified within the same class. To the extent that a Claimant or an Interest Holder has more than one Claim or Interest in a single class, such Claims or Interests shall be aggregated and treated as a single Claim or a single Interest. To the extent that a Claimant and/or Interest Holder has Claims and/or Interests in different classes, such Claims and/or Interests shall not be aggregated.

As provided in the Bankruptcy Code, certain groups of Claims (or potential Claims) are not classified for treatment under the Plan. Other Claims are placed in classes, and are listed below as well.

### 6.1   Class 1 – Allowed Administrative Expense Claims

Debtor estimates that Class 1 claims total approximately $150,000. Unless otherwise agreed, each Allowed Administrative Expense Claim shall be paid in full in Cash and Discharged by no later than the later of (a) the Effective Date or (b) fifteen (15) days after the Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims that represent undisputed liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with any related agreements.

Class 1 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from members of such Class will not be solicited.

### 6.2     Class 2 – Allowed Secured Ad Valorem Tax Claims

Class 2 consists of Secured Ad Valorem Tax Claims. Debtor estimates that Class 2 claims total $545.32. Unless otherwise agreed, each Allowed Ad Valorem Tax Claim shall be paid in full in Cash and Discharged by no later than the later of (a) the Effective Date or (b) fifteen (15) days after the Secured Ad Valorem Tax Claim becomes an Allowed Secured Ad Valorem Tax Claim.

**Release of Lien:** Transfer of Collateral and/or proceeds pursuant to Article 6.2 shall be in full satisfaction and Discharge of Class 2 Claims and Class 2 claimants shall promptly provide all such documents to release liens and security interest.

Class 2 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from members of such Class will not be solicited.

### 6.3     Class 3 – Allowed Federal Tax Claims

Class 3 consists of Federal Tax Claims. Debtor estimates that Class 3 claims total $5,000.00. Unless otherwise agreed, each Federal Tax Claim shall be paid in full in Cash and Discharged by no later than the later of (a) the Effective Date or (b) fifteen (15) days after the Federal Tax Claim becomes an Allowed Federal Tax Claim.

Class 3 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from members of such Class will not be solicited.

### 6.4     Class 4 – Allowed Priority Wage Claims

Class 4 consists of priority wage claims. Debtor estimates that Class 4 claims total approximately $21,900.00. Unless otherwise agreed, each Priority Wage Claim shall be paid in full in Cash and Discharged by no later than the later of (a) the Effective Date or (b) fifteen (15) days after the Priority Wage Claim becomes an Allowed Priority Wage Claim.

Class 4 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from members of such Class will not be solicited.

### 6.5     Class 5 – Allowed Secured Claim of Forest Oil Corporation

Forest Oil Corporation has filed a secured proof of claim in the amount of $878,153.43. However, FOC's judgment is $32,007.21 and the jury specifically denied the recovery which FOC now seeks in its proof of claim. The basis of Forest's claims is subject to the Appeal. Unless otherwise agreed, at the Debtor's election to occur within thirty (30) days of the later date of (i) final determination of the issues on Appeal, or (ii) the Claim of Forest Oil Corporation becoming an Allowed Secured Claim of Forest Oil Corporation, the Debtor will elect to either (i) transfer collateral in full satisfaction of the Allowed Claim of Forest Oil Corporation, or (ii) pay the Allowed Claim of Forest Oil Corporation in full.

Until the issues on Appeal are resolved and the Claim of Forest Oil Corporation becomes an Allowed Claim, the Debtor will pay (i) an initial deposit of $16,000.00 within thirty (30) days of the Effective Date, and (ii) monthly installments of $2,000.00 thereafter into an escrow account until the escrow account obtains a balance of $32,007.21 for the benefit of Forest Oil Corporation to be distributed to Forest Oil Corporation upon the Debtor's election to pay the Allowed Claim of Forest Oil Corporation in full.

In addition, within thirty (30) days of the Effective Date, the Debtor will pay interest on $32,007.21 at a rate of three percent (3%) per annum (which is in excess of the current rate of 1.12%) which amount shall be deposited into the escrow account to be distributed to Forest Oil Corporation upon the Debtor's election to pay the Allowed Claim of Forest Oil Corporation in full.

The escrow account will be opened at a U.S. Trustee-approved institution entitled "Reserve for Disputed Forest Oil Corporation Claim."

**Release of Lien:**   Transfer of Collateral and/or proceeds pursuant to Article 6.5 shall be in full satisfaction and Discharge of Class 5 Claims and Class 5 claimants shall promptly provide all such documents to release liens and security interest.

Class 5 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from members of such Class will not be solicited.

### 6.6     Class 6 - Allowed Secured Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc.

Mariner Energy, Inc./Mariner Energy Resources, Inc. ("Mariner") has filed a secured proof of claim in the amount of $5,837,959.35. However, Mariner's judgment is $428,316.00 and the jury specifically denied portions of the claims which Mariner now seeks in its proof of claim. Additionally, portions of the claim appear duplicative of amounts included in the judgment or are not presently due and payable under the applicable contracts. The basis of Mariner's claims is subject to the Appeal. Unless otherwise agreed, at the Debtor's election to occur within thirty (30) days of the later date of (i) final determination of the issues on Appeal, or (ii) the Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc. becoming an Allowed Secured Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc., the Debtor will elect to either (i) transfer collateral in full satisfaction of the Allowed Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc., or (ii) pay the Allowed Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc. in full.

Until the issues on Appeal are resolved and the Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc. becomes an Allowed Claim, the Debtor will pay (i) an initial deposit of $214,000.00 within thirty (30) days of the Effective Date, and (ii) monthly installments of $26,750.00 thereafter into an escrow account until the escrow account obtains a balance of $428,316.00 for the benefit of Mariner Energy, Inc./Mariner Energy Resources, Inc. to be distributed to Mariner Energy, Inc./Mariner Energy Resources, Inc. upon the Debtor's election to pay the Allowed Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc. in full.

In addition, within thirty (30) days of the Effective Date, the Debtor will pay interest on $428,316.00 at a rate of three percent (3%) per annum (which is in excess of the current rate of 1.12%) which amount shall be deposited into the escrow account to be distributed to Mariner Energy, Inc./Mariner Energy Resources, Inc. upon the Debtor's election to pay the Allowed Claim of Mariner Energy, Inc./Mariner Energy Resources, Inc. in full.

The escrow account will be opened at a U.S. Trustee-approved institution entitled "Reserve for Disputed Mariner Energy, Inc./Mariner Energy Resources, Inc. Claim."

**Release of Lien:** Transfer of Collateral and/or proceeds pursuant to Article 6.6 shall be in full satisfaction and Discharge of Class 6 Claims and Class 6 claimants shall promptly provide all such documents to release liens and security interest.

Class 6 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from members of such Class will not be solicited.

### 6.7 Class 7 – Allowed General Unsecured Claims

Proofs of claim have been filed asserting general unsecured claims in Class 7 in the amount of approximately $295,898.00. The Debtor scheduled undisputed claims in Class 7 in an amount of approximately $307,283.74. Unless otherwise agreed, the Debtor will pay the Allowed General Unsecured Claims in pro rata monthly installments totaling $30,000 collectively until Allowed General Unsecured Claimants receive 80% of their Allowed General Unsecured Claim commencing by no later than the later of (a) within forty-five (45) days of the Effective Date, or (b) thirty (30) days after a General Unsecured Claim becomes an Allowed General Unsecured Claim.

In the event that Mariner prevails on the Appeal and obtains a higher judgment, then the payout to unsecured creditors will likely be diminished.

Class 7 is impaired. Therefore, a vote for acceptance or rejection of the Plan will be solicited from the Claimants in such Class.

### 6.8 Class 8 – Allowed Claims Related to High Island A-96

Class 8 consists of claims asserted by Texas Standard Oil & Gas, L.P., Grimes Energy Company, and PetroVal, Inc., which total $186,300.00 per the filed proofs of claim as of the date of this Disclosure Statement. Unless otherwise agreed, each Allowed Claim Related to High Island A-96 shall be satisfied in full as follows:

The Debtor shall assign twenty percent (20%) of record title of High Island A-96 to Texas Standard Oil & Gas, LP within forty-five (45) days of the Effective Date.

The Debtor shall assign fifteen percent (15%) of record title of High Island A-96 to Grimes Energy Company within forty-five (45) days of the Effective Date.

The Debtor shall assign twenty-five percent (25%) of record title of High Island A-96 to PetroVal, Inc. within forty-five (45) days of the Effective Date.

To the extent the Debtor receives compensation for these assignments, the Debtor anticipates such compensation will be immaterial to the Plan.

Claim 8 is impaired. Therefore, votes for acceptance or rejection of the Plan for members of such Class will be solicited.

### 6.9    Class 9 – Ownership Interests

The current ownership interest holders shall retain their respective ownership interests in the Reorganized Debtor

Class 9 is unimpaired. Therefore, votes for acceptance or rejection of the Plan from holders of the ownership interests in such Class will not be solicited.

## ARTICLE 7 – PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND MAKING DISTRIBUTIONS UNDER THE PLAN

### 7.1    Objection Deadline

As soon as practicable, but in no event later than sixty days after the Effective Date, unless extended by order of the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

### 7.2    Prosecution of Objections

On and after the Effective Date, except as the Bankruptcy Court may otherwise order, the filing, litigation, settlement or withdrawal of all objections may be made by the Reorganized Debtor.

### 7.3    Distributions

#### 7.3.1    Payment of Distributions

On the Effective Date, the Debtor shall pay in full and in cash all Allowed Claims in Classes 1, 2, 3 and 4.

#### 7.3.2    Distributions to Class 5

Payments to the holder of the Allowed Secured Claim of Forest Oil Corporation in Class 5 shall be made in accordance with the provisions of Article 8.1 of the Plan. Within thirty (30) days of

the Debtor's election described in Article 8.1, the Debtor shall either surrender collateral securing the Allowed Secured Claim of Forest Oil Corporation to Forest Oil Corporation in full satisfaction of its Allowed Claim, or distribute to Forest Oil Corporation funds sufficient to pay the Allowed Secured Claim of Forest Oil Corporation in full.

### 7.3.3 Distributions to Class 6

Payments to the holder of the Allowed Secured Claim of Mariner Resources, Inc./Mariner Energy Resources, Inc. in Class 6 shall be made in accordance with the provisions of Article 9.1 of the Plan. Within thirty (30) days of the Debtor's election described in Article 9.1, the Debtor shall either surrender collateral securing the Allowed Secured Claim of Mariner Resources, Inc./Mariner Energy Resources, Inc. to Mariner Resources, Inc./Mariner Energy Resources, Inc. in full satisfaction of its Allowed Claim, or distribute to Mariner Resources, Inc./Mariner Energy Resources, Inc. funds sufficient to pay the Allowed Secured Claim of Mariner Resources, Inc./Mariner Energy Resources, Inc. in full.

### 7.3.4 Distributions to Class 7

On the Effective Date, or as soon thereafter as is reasonably practicable, but in no event more than forty-five (45) days after the Effective Date, the Reorganized Debtor shall begin to make pro rata monthly distributions to Allowed General Unsecured Claimants pursuant to Article 10.1 of the Plan. Distributions to disputed claims shall be reserved until such disputes are resolved by Final Order.

### 7.3.5 Distributions to Class 8

Within forty-five (45) days of the Effective Date, the Reorganized Debtor shall execute assignments to holders of Allowed claims Related to High Island A-96 as set forth in Article 11.1 of the Plan.

### 7.3.6 Delivery of Distributions by Debtor

Subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth in the proofs of Claim or proofs of Equity Interest filed by such holders (or at the last known address of such a holder if no proof of Claim or proof of Equity Interest is filed or if the Plan Trustee has been notified in writing of a change of address). If any holder's Distribution is returned as undeliverable, no further distribution to such holder shall be made unless and until the Debtor or Reorganized Debtor is notified of such holder's then current address, at which time all undelivered Distributions shall be made to such holder without interest.

### 7.3.7 Reserves for Disputed Claims

#### 7.3.7.1 Amount of Reserves

Except to the extent that the Bankruptcy Court shall determine that a lesser amount is adequate, the Reorganized Debtor shall deposit sufficient funds payable to disputed claims into an

escrow account until such disputes are resolved by Final Order unless otherwise provided for in the Plan.

### 7.3.7.2     Held in Trust

All earnings on funds deposited in the Disputed Claims Reserve Account or proceeds from liquidation of Assets held in the Disputed Claims Reserve Account, shall be held in trust in the Disputed Claims Reserve Account and shall be distributed only in the manner provided in this Plan.

### 7.3.7.3     Release of Reserves from Disputed Claims Reserve Account

At such time as all or any portion of a Disputed Claim becomes an Allowed Claim, the Distributions reserved for such Disputed Claim or portion (including any interest thereon or dividends received with respect thereto) shall be released from the Disputed Claims Reserve Account and paid or distributed by the Reorganized Debtor to the holder of such Allowed Claim, net of any taxes or other applicable charges required to be paid by the Reorganized Debtor in respect thereof unless otherwise provided for in the Plan.

At such time as all or any portion of a Disputed Claim is determined not to be an Allowed Claim, the Distributions reserved for such Disputed Claim or portion (including any interest thereon or dividends received with respect thereto) shall be in the case of Cash, released from the Disputed Claims Reserve Account and paid to holders of Allowed Claims in Class 7.

### 7.3.8   Unclaimed Distributions

### 7.3.8.1     Safeguarding of Unclaimed Distributions

For a period of six (6) months following the earlier of the Effective Date or date of Distribution, Distributions, including any interest as may have been earned thereon and dividends as may have been received with respect thereto, that have not been claimed shall be held by the Reorganized Debtor in the Disputed Claims Reserve Account, solely for the benefit of the holders of Allowed Claims and Allowed Administrative Claims that have failed to claim such Distributions and shall be released from the Disputed Claims Reserve Account and delivered to such holder, net of any taxes or other applicable charges required to be paid by the Reorganized Debtor in respect thereof, upon presentation of proper proof by such holder of its entitlement thereto.

### 7.3.8.2     Release of Unclaimed Distributions

On the date on which all or any portion of any Distribution becomes an Unclaimed Distribution (including interest thereon and dividends with respect thereto), such Unclaimed Distribution shall be released by the Reorganized Debtor from the Disputed Claims Reserve Account and paid or reallocated to holders of Allowed Claims in Class 7.

### 7.3.9   Form of Distributions

Any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required by an order of the Bankruptcy Court.

### 7.3.10  Rounding

Whenever a payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

### 7.3.11  Disputed Payment

In the event that any dispute arises as to the right of a holder of an Allowed Claim to receive any Distribution to be made under this Plan, the Reorganized Debtor may, in lieu of making such Distribution to such holder, make such Distribution into an escrow account or hold such Distribution until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 7.3.12  De Minimus Distributions

No Distribution of less than five dollars ($5) shall be made to any holder of an Allowed Claim.  Such undistributed amount shall be retained the Reorganized Debtor.

### 7.4     Means of Cash Payment

Cash payments made pursuant to the Plan shall be in U.S. funds, by check drawn on a domestic bank, or, at the Reorganized Debtor's option, as appropriate, by wire transfer from a domestic bank, except that payments made to foreign creditors holding Allowed Claims may be in such funds and by such means as are customary or as may be necessary in a particular foreign jurisdiction.

### 7.5     Time Bar to Cash Payments

Checks issued by the Reorganized Debtor in respect of Allowed Claims shall be null and void if not negotiated within six months after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 90 days after the date of issuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

### 7.6     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim.

### 7.7     Distributions After Allowance

Payments and distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs.

## ARTICLE 8 – SELECT OTHER PROVISIONS OF THE PLAN

### 8.1    Corporate Authority

All actions and transactions contemplated under the Plan shall be authorized upon confirmation of the Plan without the need of further board or stockholder resolutions, approval, notice or meetings, other than the notice provided by serving this Plan on all known creditors of the Debtor, all known Equity Interest Holders as of the Voting Deadline, and all current directors of the Debtor.  The Confirmation Order shall include provisions dispensing with the need of further board or stockholder resolutions, approval, notice or meetings and authorizing and directing the President and Sole Director of the Debtor to execute such documents necessary to effectuate the Plan, which documents shall be binding on the Debtor, the Debtor's creditors and all of the Debtor's Interest holders.

### 8.2    Injunctions

Except as provided in the Plan or Confirmation Order, on and as of the Effective Date all entities that currently hold or may come to hold a Claim or other debt or liability that is Discharged are permanently enjoined from taking any of the following actions on account of any such Discharged Claims, debts or liabilities: (a) asserting commencing or continuing in any manner any action or other proceeding against Reorganized Debtor or its property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Reorganized Debtor or its property; (c) creating, perfecting or enforcing any lien or encumbrance against Reorganized Debtor or its property; (d) asserting a setoff, right of subrogation or recoupment right of any kind against any debt, liability or obligation due to Reorganized Debtor or in connection with its property; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### 8.3    Discharge

Except as otherwise provided in this Plan or in the Confirmation Order, entry of the Confirmation Order acts as a Discharge effective as of the Effective Date of any and all Claims against and Equity Interests in the Debtor or any of its Assets or properties.  In addition, pursuant to the Confirmation Order the substantial consummation of the Plan on the Effective Date acts as a Discharge effective as of the Effective Date of all Claims and Equity Interests of any holder of a Claim against or Equity Interest in the Debtor that is classified under this Plan and any direct or indirect right or Claim such Person had or may have had against the Debtor.  The discharge of the Debtor shall be effective as to each Claim or Interest except as otherwise expressly provided for in the Confirmation Order, regardless of whether a proof of Claim or Equity Interest therefore was filed, whether the Claim or Equity Interest is a Disputed Claim or Equity Interest or an Allowed Claim, Allowed Interest or Allowed Administrative Claim, or whether the holder thereof votes to accept or reject the Plan.

### 8.4    Conditions to Confirmation

The Plan may only be confirmed if Debtor receives payment in full from MOSH Holding LP.

### 8.5    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights, obligations and provisions of this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the conflicts of laws principles thereof.

### 8.6    Modification of Plan

This Plan may be altered, amended or modified by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law.

### 8.7    Severability

Should the Bankruptcy Court determine that any provision in this Plan be determined to be unenforceable, either on its face or as applied to any Claim or Equity Interest or transaction, the Debtor may modify this Plan in accordance with Article 18.5 of the Plan so that such provision shall not be applicable to the holder of any Claim or Equity Interest. Such determination shall in no way limit or affect the enforceability and operative effect of any other provision within this Plan.

### 8.8    U.S. Trustee Quarterly Fees

The Reorganized Debtor shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6). Any fees due as of the date of confirmation of the plan will be paid in full on or before the Effective Date of the plan. After confirmation, the Reorganized Debtor shall pay United States Trustee quarterly fees as they accrue until its case is closed by the Court. The Reorganized Debtor shall file with the Court and serve on the United States Trustee a financial report for each quarter, or portion thereof, that its chapter 11 case remains open in a format prescribed by the United States Trustee.

The Reorganized Debtor shall be responsible post-confirmation for the payment of quarterly fees and reporting of monthly financial information.

## ARTICLE 9 – LIQUIDATION ANALYSIS

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met. One of these requirements is that each non-accepting holder of an Allowed Claim or Interest must receive or retain under the Plan, on account of such Claim or Interest, property as of the Effective Date of the Plan at least equal to the value such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This is clearly so in this case because in a Chapter 7 liquidation, the Debtor anticipates that it would receive only $720,862 for its assets as evidenced by the liquidation analysis attached hereto as *Exhibit "C"*. Unsecured creditors would receive considerably less in liquidation than as proposed under the Plan because instead of the Debtor distributing income from the wells over time to creditors, creditors would only receive an estimated 25% of that income. In addition, the liquidated amounts would be further reduced by the costs of liquidation and a Chapter 7 proceeding.

Costs of liquidation under Chapter 7 of the Bankruptcy Code would include (i) the compensation of the Chapter 7 Trustee; (ii) asset disposition expense; (iii) all unpaid expenses incurred by debtor in the Chapter 11 that are allowed in the chapter 7 case (such as compensation of attorneys and accountants); (iv) litigation costs; and (v) claims arising from operations during pendency of the chapter 11 case. The liquidation itself could trigger certain additional Priority Claims and would accelerate other priority payments that otherwise would be due in the ordinary course of business. Any additional priority claims also would be paid in full out of the liquidation proceeds before the balance would be made available to pay general unsecured claims.

In the event of conversion to Chapter 7, all Assets and property of the Debtor and any subsequently acquired property of the Reorganized Debtor shall re-vest in the Debtor and constitute property of the bankruptcy estates in the converted cases. Upon an order of the Court converting the bankruptcy cases to Chapter 7, a subsequent trustee may exercise the remedy contemplated by 11 U.S.C. § 1112(b)(4)(N).

## ARTICLE 10 – OTHER LITIGATION

### 10.1   Bankruptcy Causes of Action

#### 10.1.1 Preferences

Pursuant to the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the debtor's and the transferee's business according to the ordinary business terms are not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a transfer is recovered by debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery. The Debtor reserves all rights to pursue, in its sole discretion, any preference to the full extent allowed under the Bankruptcy Code and applicable state laws.

Attached hereto as *Exhibit "G"* is a list of all payments to creditors over the statutory floor for preferences made by the Debtor within the ninety days prior to filing Chapter 11 and to insiders within the one year prior to filing Chapter 11. The Debtor has not made any analysis with regard to whether specific payments upon the list are preferences, within the meaning of the Bankruptcy Code, nor whether any such payment would have a defense available to a preference action, e.g., the ordinary course of business defense. However, any party on the list is cautioned that the Reorganized Debtor is reserving the right to review and, if the Reorganized Debtor believes appropriate, assert that any and all payments contained on the attached *Exhibit "G"* are preference payments within the meaning of the Bankruptcy Code and therefore should be returned to the bankruptcy estate.

### *10.1.2    Fraudulent Transfers*

Under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered it insolvent if, and to the extent, the debtor receives less than fair value for such property. The Debtor reserves all rights to pursue, in its sole discretion, any fraudulent transfer to the full extent allowed under the Bankruptcy Code and applicable state laws.

### *10.1.3    Potential Litigation*

In addition to the foregoing, certain of the Claims may be subject to offset. There also may exist claims and causes of action against third parties arising prior to the Petition Date. These causes of action may be enforced either by way of setoff against Claims filed against the bankruptcy estate or may be prosecuted by the Reorganized Debtor. The Reorganized Debtor has sole discretion to object to any Claims and to prosecute any objection as it sees fit.

### *10.2    Pre-Bankruptcy Lawsuits*

Pre-petition, a judgment was entered in Case No. G-05-490 *Texas Standard Oil Company v. Forest Oil Corporation, et al* in the United States District Court for the Southern District of Texas, Houston Division.

On March 9, 2008, FOC, MER, MEI, AC, NEI and CR timely appealed the MSJ Order, Final Judgment, and order denying post trial motions [Case No. G-05-490, docket no. 196]. On April 10, 2008, the Debtor cross-appealed the MSJ Order, Final Judgment, and order assessing costs against the Debtor in favor of FOC, MER, and MEI [Case No. G-05-490, docket no. 197]. The style of the Lawsuit on appeal in the Fifth Circuit Court of Appeals is Case No. 08-40390; *Texas Standard Oil Company v. Forest Oil Corporation, et al.*

### *10.3    Plan Treatment of Lawsuits*

On the Effective Date, except for the Mariner Lawsuit and Appeal, all lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a Claim against the Debtor, shall be dismissed as to the Debtor, except proof of claims and/or objections thereto pending in the Bankruptcy Court. Such dismissal shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan. All parties to any such action shall be enjoined by the Bankruptcy Court in the Confirmation Order from taking any action to impede the immediate and unconditional dismissal of such actions. All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtor against a person shall remain in place only with respect to the claim(s) asserted by the Debtor, and shall become property of the Reorganized Debtor to prosecute, settle or dismiss as it sees fit.

## ARTICLE 11  –  MANAGEMENT OF REORGANIZED DEBTOR

The Reorganized Debtor will consist of the Assets and operations of the Debtor, and the sole director and president shall be Charles Sharman or a person or entity of his choosing.

## ARTICLE 12 – FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 12.1    General

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR AND TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986 (TITLE 26, UNITED STATES CODE), AS AMENDED TO THE DATE HEREOF (THE "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF.  CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW.  NO RULINGS HAVE BEEN REQUESTED FROM THE IRS. MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.

THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR THE HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS (SUCH AS HOLDERS WHO DO NOT ACQUIRE THEIR CLAIM ON ORIGINAL ISSUE), NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAX PAYERS (SUCH AS DEALERS IN SECURITIES, S CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS). NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED.

THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN.  THE DEBTOR ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONFIRMATION AND RECEIPT OF ANY DISTRIBUTION UNDER THE PLAN MAY HAVE ON ANY GIVEN CREDITOR OR OTHER PARTY IN INTEREST.

No administrative rulings will be sought from the Internal Revenue Service (hereinafter **"IRS"**) with respect to any of the federal income tax aspects of the Plan.  Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

### 12.2    IRS Circular 230 Disclosure

**THIS DISCLOSURE STATEMENT IS WRITTEN TO SUPPORT THE PROMOTION OR THE MARKETING OF TRANSACTIONS DISCUSSED HEREIN. TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE DEBTOR IS INFORMING YOU THAT THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER UNDER THE TAX CODE. TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### 12.3    Consequences to Holders of Claims

#### 12.3.1   Realization and Recognition of Gain or Loss in General

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim will depend, among other things, upon the origin of the Holder's Claim, when the Holder's Claim becomes an Allowed Claim, when the Holder received payment in respect of such Claim, whether the Holder reports income using the accrual or cash method of accounting, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such claim, whether the Claimant receives consideration in more than one tax year of the Claimant, whether the Claimant is a resident of the United States, whether all the consideration received by the Claimant is deemed to be received by that Claimant in an integrated transaction and whether the Holder's Claim constitutes a "security" for federal income tax purposes.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash and the issue price of any debt instrument (other than any consideration attributable to a Claim for accrued but unpaid interest), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the Holder's claim, such as (i) the nature and origin of the Claim; (ii) the tax status of the holder of the Claim; (iii) whether the holder is a financial institution; (iv) whether the Claim is a capital asset in the hands of the holder; (v) whether the Claim has been held for more than one (1) year; (vi) the extent to which the holder previously claimed a loss, bad debt deduction or charge to a reserve for bad debts with respect to the Claim, and is discussed below.

Whether or not such realized gain or loss will be recognized (*i.e.*, taken into account) for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other 'reorganization" as defined in the Tax Code, which may in turn depend upon whether the Claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations. One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof. In general, the longer the term of an instrument, the greater the likelihood that it will

be considered a security. As a general rule, a debt instrument having an original term of 10 years or more will be classified as a security, and a debt instrument having an original term of fewer than five years will not. Debt instruments having a term of at least five years but less than 10 years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued, and other factors. Each Holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

### 12.3.2  Accrued Interest

The Debtor intends to take the position that all payments in respect of Allowed Claims will be first allocated to the principal amount of the Allowed Claim, with any excess allocated to accrued unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a Holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a Holder generally will recognize a deductible loss to the extent any accrued interest claimed was previously included in gross income and is not paid in full. Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.

A Holder, who, under his accounting method, was not previously required to include in income, accrued but unpaid interest attributable to its existing Claims, and who exchanges its interest Claim for cash, or other property, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Holder realizes an overall gain or loss as a result of the exchange of its existing Claims.

### 12.3.3  Withholding

All distributions to Holders of claims under the Plan are subject to any applicable withholding. Under federal income tax law, interests, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a 28% rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("*TIN*"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### 12.4  Consequences to Debtor or Reorganized Debtor - Discharge of Indebtedness Income Generally

In general, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any

previously amortized original issue discount and less the amount of any previously amortized bond issue premium) gives rise to cancellation of indebtedness ("***COD***") income which must be included in a debtor's income for federal income tax purposes, unless, in accordance with section 108(e)(2) of the Tax Code, payment of the liability would have given rise to a deduction. A corporate debtor that issues its own stock or its own debt in satisfaction of its debt is treated as realizing COD income to the extent the fair market value of the stock or the issue price of new debt issued is less than the adjusted issue price of the old debt. COD income is not recognized by a taxpayer that is a debtor in a title 11 (bankruptcy) case if a discharge is granted by the Bankruptcy Court or pursuant to a plan approved by the Bankruptcy Court (the "***Bankruptcy Exclusion Rules***").

The Debtor has not determined if any COD income will be realized pursuant to the Plan, but believes that the COD income, if any, will not be recognized by the Debtor due to the Bankruptcy Exclusion rules. However, the Debtor, as a result of the exception, may be subject to a reduction of certain of its "tax attributes" to the extent that COD income is not recognized under the Bankruptcy Exclusion Rules. Thus, while the Debtor will not recognize taxable income from discharge of indebtedness, it may experience reductions in (i) any net operating losses ("***NOL***") that have accumulated, (ii) the tax basis of its property, and (iii) other tax attributes, as set forth in section 108(b)(2) of the Tax Code.

Nothing herein shall be construed as advice to Reorganized Debtor; Reorganized Debtor is relying solely on its own counsel and/or professionals for such advice.

## ARTICLE 13 – REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### *13.1*    *General Confirmation Requirements*

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. If those requirements have been satisfied, the Court will enter the Confirmation Order. The requirements for confirmation under the Bankruptcy Code are as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and is not by any means forbidden by law.

- Any payment made or promised by the proponents of the Plan or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Cases, was disclosed to the Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable.

- The proponent of the Plan has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as director, officer or voting trustee

of the Debtor, any affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or the continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy.

- The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of the compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

- With respect to each Class of impaired Claims, either each holder of a Claim in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claims property of a value, as of the Effective Date of the Plan, that is not less than the amount such Claimant would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Subject to the Plan proponent's "cramdown" right described in Article 13.2 which follows, each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim and except as to Cure Payments, the Plan provides that Administrative Expense Claims will be paid in Cash in full on the Effective Date and that any tax Claim entitled to priority under section 507(a)(7) is being paid in full in deferred Cash payments, over a period not exceeding five years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.

- At least one impaired Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that the confirmation requirements applicable to the Case are met under the Plan. The Debtor will present evidence in support of each applicable requirement at the Confirmation Hearing.

### 13.2   *Potential Cramdown of the Plan*

If any impaired Class of Claims does not vote to accept the Plan, the Court may nevertheless confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

If the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" to each Class of dissenting Creditors and/or Stockholders, the Court may confirm the Plan through "cramdown." The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive.

With respect to each dissenting Class of Unsecured Claims, "fair and equitable" means either: (i) the members of each dissenting impaired Class of Unsecured Claims receive property of a value, as of the Effective Date of the Plan, equal to the amount of their Allowed Claim; or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of Unsecured Claims will not receive any property under the Plan. The Plan is not fair and equitable to a Class of interests if any Class of Claims is paid more than in full.

## ARTICLE 14 – CONCLUSION

Through confirmation of the Plan, the Debtor believes that it can resolve all Claims that have been, or could be, asserted against them in a timely and cost effective manner. The Debtor believes that the Plan provides a mechanism to resolve and provide just compensation to all Claimants. The Debtor believes that the Plan is fair to all parties-in-interest and should be approved by Creditors.

**TEXAS STANDARD OIL COMPANY URGES YOU TO VOTE TO ACCEPT THE PLAN.**

Dated: January 19, 2009.

**TEXAS STANDARD OIL COMPANY**

*Charley Sharman*   signed by permission

Charles Sharman                          HHM

Its:  President and Sole Director

APPROVED:

**HUGHESWATTERSASKANASE, LLP**

Wayne Kitchens          TBN 11541110
David Askanase          TBN 01390000
Heather Heath McIntyre  TBN 24041076
333 Clay, 29th Floor
Houston, Texas 77002
Telephone: (713) 759-0818
Fax:  (713) 759-6834
**ATTORNEYS FOR TEXAS STANDARD**
**OIL COMPANY**

**List of Exhibits**:

*Exhibit A* – *First Amended* Plan of Reorganization

*Exhibit B* – Order Approving Disclosure Statement

*Exhibit C* – Liquidation Analysis

*Exhibit D* – Cash Flow Projection

*Exhibit E* – Projected Income Analysis for Davis Trust Well

*Exhibit F* – Projected Income Analysis for Apache Well

*Exhibit G* – Payments to Creditors within 90 Days of Filing Bankruptcy and to Insider within the One Year Prior to Filing Bankruptcy

*Exhibit H* – List of Assumed Contracts